## *PRELIMINARY PRINT*

# VOLUME 602 U. S. PART 1

### PAGES 653–679

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 20, 2024

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# GONZALEZ *v.* TREVINO ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 22–1025.  Argued March 20, 2024—Decided June 20, 2024

In *Nieves* v. *Bartlett*, the Court held that a plaintiff bringing a retaliatory-arrest claim "must plead and prove the absence of probable cause for the arrest."  587 U. S. 391, 402.  *Nieves* recognized an exception to that rule, namely, that the existence of probable cause does not defeat a plaintiff's claim if he produces "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."  *Id.*, at 407.  The Court granted certiorari to consider whether the Fifth Circuit properly applied these principles to petitioner Sylvia Gonzalez's retaliatory-arrest claim.

Gonzalez claims that her arrest for violating a Texas anti-tampering statute was in retaliation for gathering signatures on a petition seeking the removal of the city manager of Castle Hills, Texas.  To bolster her claim, Gonzalez alleges that the past decade's misdemeanor and felony data for Bexar County (where Castle Hills is located) shows that the Texas anti-tampering statute has never been used in the county to criminally charge someone for the sort of conduct Gonzalez had engaged in.  The District Court denied the defendants' motion to dismiss, but the Fifth Circuit reversed, concluding that because Gonzalez could not provide "comparative evidence" of "otherwise similarly situated individuals who engaged in the same criminal conduct but were not arrested," Gonzalez could not qualify for the *Nieves* exception, 42 F. 4th 487, 493.

*Held*: In requiring petitioner Gonzalez to provide specific comparator evidence to support her retaliatory-arrest claim, the Fifth Circuit took an overly cramped view of *Nieves.*  The Court recognized the *Nieves* exception to account for "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."  587 U. S., at 406.  The only express limit the Court placed on the sort of evidence a plaintiff may present to show their arrest occurred under such circumstances is that it must be objective.  *Id.*, at 407.  Gonzalez provided a permissible type of evidence because the fact that no one has ever been arrested for engaging in a certain kind of conduct makes it more likely that an officer *has* declined to arrest someone for engaging in such conduct in the past.  Gonzalez's survey is objective evidence tending to show that she "was arrested when otherwise simi-

Syllabus

larly situated individuals not engaged in the same sort of protected speech had not been." *Ibid.*

42 F. 4th 487, vacated and remanded.

*Anya Bidwell* argued the cause for petitioner. With her on the briefs were *Patrick Jaicomo, Will Aronin,* and *Marie Miller.*

*Nicole Frazer Reaves* argued the cause for the United States as *amicus curiae* supporting neither party. With her on the brief were *Solicitor General Prelogar, Assistant Attorney General Clarke, Deputy Solicitor General Feigin, Tovah R. Calderón,* and *Jessica Merry Samuels.*

*Lisa S. Blatt* argued the cause for respondents. With her on the brief were *Sarah M. Harris, Aaron Z. Roper, Scott M. Tschirhart,* and *Lowell F. Denton.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Vera Eidelman, Esha Bhandari, David D. Cole, Cecillia D. Wang, Barbara E. Bergman, J. T. Morris, Darpana Sheth, Clark M. Neily III,* and *Anastasia P. Boden*; for the Constitutional Accountability Center et al. by *Elizabeth B. Wydra, Brianne J. Gorod, Brian R. Frazelle, Mary B. McCord, Kelsi Brown Corkran,* and *Shelby Calambokidis*; for the Institute for Free Speech by *Easha Anand, Pamela S. Karlan, Jeffrey L. Fisher,* and *Alan Gura*; for the Law Enforcement Action Partnership by *David Debold*; for the National Police Accountability Project by *Charles A. Rothfeld, Eugene R. Fidell, Paul W. Hughes,* and *Michael B. Kimberly*; for the Reporters Committee for Freedom of the Press by *Bruce D. Brown*; for the Roderick & Solange MacArthur Justice Center by *Devi M. Rao*; for the Thomas More Society by *Thomas Brejcha, B. Tyler Brooks,* and *Joan M. Mannix*; and for Fane Lozman by *Anton Metlitsky* and *Kerri L. Barsh.*

Briefs of *amici curiae* urging affirmance were filed for the State of Alaska et al. by *Treg Taylor,* Attorney General of Alaska, and *Kimberly D. Rodgers,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Ashley Moody* of Florida, *Lynn Fitch* of Mississippi, *Austin Knudsen* of Montana, *Michael T. Hilgers* of Nebraska, *Drew H. Wrigley* of North Dakota, *Dave Yost* of Ohio, *Alan Wilson* of South Carolina, *Marty Jackley* of South Dakota, and *Sean D. Reyes* of Utah; for the State of Texas by *Ken Paxton,* Attorney General of Texas, *Aaron L. Nielson,* Solicitor General, *Brent Webster,* First Assistant Attorney General, *Lanora C. Pettit,* Principal Deputy Solicitor General, and

PER CURIAM.

In *Nieves* v. *Bartlett*, 587 U. S. 391, 402 (2019), this Court held that, as a general rule, a plaintiff bringing a retaliatory-arrest claim "must plead and prove the absence of probable cause for the arrest." At the same time, we recognized a narrow exception to that rule. The existence of probable cause does not defeat a plaintiff's claim if he produces "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*, at 407. We granted certiorari in this case to consider whether the Fifth Circuit properly applied these principles. It did not. We therefore vacate that court's judgment and remand for proceedings consistent with this opinion.

I

In 2019, Sylvia Gonzalez ran for a seat on the city council of Castle Hills, a small town in southern Texas. While she was on the campaign trail, Gonzalez heard multiple complaints about the city manager, Ryan Rapelye. As city manager, Rapelye was responsible for, among other things, enforcing the city's laws and managing its budget.

Gonzalez was elected in May 2019. Her first act in office was to help gather signatures for a petition seeking Rapelye's removal. Eventually, over 300 residents signed the petition. The petition was introduced at the next city council meeting, where discussions grew heated after various residents rose to Rapelye's defense and spoke against Gonzalez. The discussion over the petition continued the next day.

*Kathryn M. Cherry*, Assistant Solicitor General; for the Local Government Legal Center et al. by *C. Harker Rhodes IV*; for the National Sheriffs' Association by *Gregory C. Champagne* and *Maurice E. Bostick*; and for the Texas Association of Counties et al. by *Cameron T. Norris* and *Mike Thompson, Jr.*

*Michel Paradis* filed a brief for Law Professors as *amici curiae*.

Per Curiam

At the end of the second day, Gonzalez was packing up her belongings when the mayor, Edward Trevino, II, asked her for the petition. Gonzalez indicated that the petition was in Trevino's possession, which he denied. He then asked Gonzalez to check her binder, where she found the petition. Gonzalez claims that she "did not intentionally put the petition in her binder," and that she was "surprise[d]" to find it there. Complaint and Jury Demand in No. 5:20–cv–01151 (WD Tex., Sept. 29, 2020), ECF Doc. 1, p. 11.

Trevino brought this incident to the city police's attention, and an investigation into these events soon began. Within a month, a private attorney tasked with leading the investigation concluded that Gonzalez had likely violated a Texas anti-tampering statute that, among other things, prohibits a person from intentionally "remov[ing] . . . a governmental record." Tex. Penal Code Ann. §§ 37.10(a)(3), (c)(1) (West Cum. Supp. 2023).[1]

On the private attorney's request, a local Magistrate granted a warrant for Gonzalez's arrest. When she heard the news, Gonzalez turned herself in and spent an evening in jail. The district attorney ultimately dismissed the charges. Gonzalez claims that this episode has convinced her to step away from political life.

Gonzalez brought suit under 42 U. S. C. § 1983 in Federal District Court against Trevino, along with the police chief and the private attorney in their individual capacities.[2] Her complaint alleged that she was arrested in retaliation for her role in organizing the petition for Rapelye's removal and that the defendants therefore violated her First Amendment rights.

---

[1] The statute also prohibits a person from intentionally "destroy[ing]," "conceal[ing]," or "otherwise impair[ing] the verity, legibility, or availability" of a governmental record.

[2] She also pressed a claim in this action against Castle Hills. That claim is not before us.

To bolster her claim, Gonzalez alleged that she had reviewed the past decade's misdemeanor and felony data for Bexar County (where Castle Hills is located) and that her review had found that the Texas anti-tampering statute had never been used in the county "to criminally charge someone for trying to steal a nonbinding *or* expressive document." ECF Doc. 1, at 17. Gonzalez's search turned up 215 felony indictments, and she characterized the typical indictment as involving "accusations of either using or making fake government identification documents." *Ibid.* Other felony indictments included ones for fake checks, hiding murder evidence, or cheating on government exams. Every misdemeanor case, according to Gonzalez, involved "fake social security numbers, driver's licenses, [or] green cards." *Ibid.* Gonzalez pointed to this research as evidence that the defendants had engaged in a political vendetta by bringing a "sham charge" against her. *Id.*, at 27.

The defendants moved to dismiss the complaint. They argued that the presence of probable cause defeated Gonzalez's retaliatory-arrest claims against the individual defendants. The District Court denied the defendants' motion. Although Gonzalez conceded that probable cause supported her arrest, the court allowed her claim to advance after finding that it fell within an exception to the no-probable-cause rule that we recognized in *Nieves*. *Gonzalez* v. *Castle Hills*, 2021 WL 4046758, *5, n. 7 (WD Tex., Mar. 12, 2021).

The Fifth Circuit reversed that decision on appeal. The court thought that a plaintiff's claim could fall within the *Nieves* exception only if the plaintiff proffered "comparative evidence" of "otherwise similarly situated individuals who engaged in the same criminal conduct but were not arrested." 42 F. 4th 487, 493 (2022) (internal quotation marks omitted). Gonzalez's claim failed because she did not provide such evidence.

We granted certiorari. 601 U. S. —— (2023).

## II

Gonzalez seeks reversal on two grounds. First, she asks us to reject the Fifth Circuit's rule that plaintiffs must use specific comparator evidence to demonstrate that they fall within the *Nieves* exception. Second, Gonzalez contends that the *Nieves* no-probable-cause rule applies only to claims predicated on split-second arrests, rather than deliberative ones.

We agree with Gonzalez that the Fifth Circuit took an overly cramped view of *Nieves*. That court thought Gonzalez had to provide very specific comparator evidence—that is, examples of identifiable people who "mishandled a government petition" in the same way Gonzalez did but were not arrested. 42 F. 4th, at 492. Although the *Nieves* exception is slim, the demand for virtually identical and identifiable comparators goes too far.

We recognized the *Nieves* exception to account for "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U. S., at 406. To fall within the exception, a plaintiff must produce evidence to prove that his arrest occurred in such circumstances. The only express limit we placed on the sort of evidence a plaintiff may present for that purpose is that it must be objective in order to avoid "the significant problems that would arise from reviewing police conduct under a purely subjective standard." *Id.*, at 407.

Here, Gonzalez provided that sort of evidence. She was charged with intentionally "remov[ing] . . . a governmental record." Tex. Penal Code Ann. §37.10(a)(3). Gonzalez's survey is a permissible type of evidence because the fact that no one has ever been arrested for engaging in a certain kind of conduct—especially when the criminal prohibition is longstanding and the conduct at issue is not novel—makes it more likely that an officer *has* declined to arrest someone for engaging in such conduct in the past.

Because we agree with Gonzalez's first argument, we do not need to reach her second. We vacate the judgment below and remand the case for the lower courts to assess whether Gonzalez's evidence suffices to satisfy the *Nieves* exception.

*It is so ordered.*

JUSTICE ALITO, concurring.

The *per curiam* opinion correctly decides that the Fifth Circuit took an unduly narrow view of the exception we recognized in *Nieves* v. *Bartlett*, 587 U. S. 391 (2019). I write separately to provide further guidance on the scope of that decision.

I

Because the District Court dismissed Sylvia Gonzalez's complaint for failure to state a claim, the *per curiam* opinion properly takes its facts solely from the complaint. But I provide a fuller account of the events leading up to her arrest because they may typify the messy quarrels that courts will have to sift through if we accept Gonzalez's reading of our case law.

Upon her election to the city council, Gonzalez launched a campaign to oust Ryan Rapelye from his position as city manager. As part of her efforts, Gonzalez paid personal visits to Castle Hills residents, requesting their signatures and support. According to some accounts, her efforts were aggressive. Chalene Martinez averred that Gonzalez solicited her signature "'under false pretenses'"—specifically by misleading her about the nature of the petitions and by lying about Rapelye's performance in office. Record in No. 5:20–cv–01151 (WD Tex., Sept. 29, 2020), ECF Doc. 1, p. 9; App. 45, 52. Another resident, Jesus Quilantan, reported that Gonzalez had asked to see his parents. When she learned that they were not home, Gonzalez cajoled him into signing the petition on their behalf. *Id.*, at 57. Her efforts paid off.

In a town of roughly 4,000 inhabitants, she helped garner over 300 signatures for her petition seeking Rapelye's removal.

At the next city council meeting, just over two weeks after Gonzalez's election, one resident submitted a stack of documents representing the petition to remove Rapelye. As the presiding officer of the meeting, Mayor Edward Trevino assumed control of the petition. And as the Court's opinion notes, the meeting grew contentious. Multiple residents spoke out in support of Rapelye. Martinez, for instance, accused Gonzalez of misleading residents into signing the petition based on false representations about Rapelye and the campaign for his removal. These allegations disturbed Trevino. The next morning, he arrived before the meeting resumed to see if the petition contained any anomalies. When he was finished, he fastened the documents together with a large black binder clip and placed the stack on top of his other papers on the dais.

What happened next was captured by surveillance videos.[1] Shortly before the meeting began, Trevino was engaged in conversation with two constituents. While he turned away from his papers, Gonzalez approached the dais and took the petition from his pile. After quickly flipping through its pages, Gonzalez placed the petition inside her binder.

During the meeting, Trevino could not find the petition among his papers. He also noticed that Gonzalez's binder contained a familiar stack of documents held together with a black binder clip. But Trevino chalked this up to a coincidence, and he assumed that the city secretary had already collected the petition.

Trevino dropped this assumption when the city secretary asked him for the petition after the meeting. At this point, Trevino suspected that Gonzalez had taken the petition. He

---

[1] These videos are publicly available, and they can be viewed at https://www.youtube.com/watch?v=VGXht6ARK_4 and https://www.youtube.com/watch?v=GGLIrFiso1c.

relayed those suspicions to Captain Esteban Zuniga, a police officer who was present at the meeting. Zuniga walked over to Gonzalez and asked her if she had taken the petition. After Gonzalez denied his accusation, Trevino suggested she check her binder.

This, too, was captured on tape. At Trevino's prompting, Gonzalez slowly flipped through her binder. Before she reached the binder-clipped stack, however, she stopped and once again denied possessing the petition. Trevino and Zuniga simultaneously pointed to the visible black binder clip. Forced to produce the petition, Gonzalez told Zuniga that she thought it was an extra copy.

Trevino filed a criminal complaint against Gonzalez, alleging that she had stolen the petition. See *ante*, at 656. On account of Gonzalez's political post, the police chief tasked Alex Wright—a peace officer and special detective—with leading the investigation. As a special detective, Wright is assigned cases "which might otherwise be considered sensitive . . . or delicate, either due to the nature of the crime or . . . the parties involved." App. 43.

Wright conducted a thorough investigation. He interviewed Trevino, Zuniga, and Martinez, each of whom gave him their version of these events. Zuniga said that he found it "odd" that Gonzalez claimed that she thought the petition in her binder was an "extr[a]," given that she had strenuously denied having the petition in her possession. *Id.*, at 48. After meeting with Martinez, Wright suspected that Gonzalez took the petition to avoid further scrutiny. Wright contacted Gonzalez several times to hear her side of the story, but she refused to speak with him.

The surveillance videos, moreover, confirmed Trevino and Zuniga's account of Gonzalez's evasiveness. From this evidence, Wright concluded that Gonzalez had likely violated Texas's anti-tampering statute, which makes it a crime for someone to "remov[e]" a government document intentionally, Tex. Penal Code Ann. §37.10(a)(3) (West Cum. Supp. 2023),

and he sought an arrest warrant from the local Magistrate. Wright's warrant affidavit included details from his interviews with the witnesses and his review of the surveillance videos. The Magistrate agreed that probable cause supported Gonzalez's arrest, and he granted Wright's request.

The Court's opinion completes the story. After the warrant was issued, Gonzalez spent an evening in jail. A month later, the district attorney dropped all charges against her. But Gonzalez's suit against Trevino, Wright, and the police chief is still ongoing five years later. And Gonzalez has never disputed—at any point of the litigation—that probable cause supported her arrest.

## II

Gonzalez attacks the Fifth Circuit's judgment on two fronts. First, she contends that the Fifth Circuit took an unduly restrictive view of the *Nieves* exception. Second, she asks us to cabin the no-probable-cause requirement to on-the-spot arrests. The Court briskly dispatches this case on the first question, but I think lower courts and litigants deserve additional guidance. I therefore divide my analysis into three parts. First, I provide the relevant legal background for retaliatory-arrest and retaliatory-prosecution claims. Second, I elaborate on the scope of the *Nieves* exception. Third, I explain why *Nieves* is not limited to split-second arrests.

## A

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman* v. *Moore*, 547 U. S. 250, 256 (2006). We ordinarily analyze First Amendment retaliation claims under the two-step framework set out in *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 287 (1977). At the first step, the plaintiff must demonstrate that he engaged in protected speech and that his speech was a "'sub-

stantial'" or "'motivating'" factor in the defendant's decision to take action against him. *Ibid.* Once the plaintiff makes this showing, the burden shifts to the defendant at the second step to show that he would have taken the same adverse action even in the absence of the protected speech. *Ibid.* To carry these burdens, parties operating within the *Mt. Healthy* framework may present a wide range of evidence—both objective and subjective. See, *e.g., id.,* at 282–283 (discussing the plaintiff's behavioral history in the years leading up to the litigation); *Texas* v. *Lesage,* 528 U. S. 18, 19 (1999) (*per curiam*) (the defendants produced an affidavit to explain that the plaintiff's application to graduate school was rejected because of his poor personal statement).

Our cases have admitted, however, that this framework fits uneasily with First Amendment retaliatory-arrest and retaliatory-prosecution claims for at least three reasons. First, it is all too easy for a plaintiff to subject a law-enforcement officer to the crucible of litigation based on allegations about an officer's state of mind that are easy to make and difficult to disprove. For example, a driver with an anti-police bumper sticker on his car could claim that any traffic stop was due to his protected speech. Any person who carries a sign while trespassing, blocking traffic, or disturbing the peace could similarly allege that an arrest for these offenses was motivated by the sign's message. We are loath to undertake such inquiries into subjective intent in the law-enforcement context. Cf. *Ashcroft* v. *al-Kidd,* 563 U. S. 731, 737 (2011); see also *Kentucky* v. *King,* 563 U. S. 452, 464 (2011); *Whren* v. *United States,* 517 U. S. 806, 812 (1996).

Second, protected speech is often a "wholly legitimate consideration" for officers when deciding whether to file charges or to make an arrest. *Reichle* v. *Howards,* 566 U. S. 658, 668 (2012). An "officer may decide to arrest [a] suspect because his speech provides evidence of a crime or suggests a potential threat." *Ibid.* The facts of *Nieves* itself illustrate this point. In that case, the police officers decided to arrest

the plaintiff for disorderly conduct and resisting arrest because "they perceived [the plaintiff] to be a threat" based in part on the combative tone and content of his speech. 587 U. S., at 401. And no one suggested that an individual's speech is off-limits in this respect. *Ibid.* (explaining that "the content and manner of a suspect's speech" may provide important information for law enforcement).

Third, the machinery of criminal justice often works through multiple government officers. An officer who makes an arrest may do so based on his own judgment, orders from a superior, or as in this case, a warrant issued by a magistrate. Thus, it is often challenging to draw a straight line between the plaintiff's protected speech and the defendant from whom he seeks recovery. In such circumstances, it may be difficult to discern whether the officer acted improperly. Cf. *Messerschmidt* v. *Millender*, 565 U. S. 535, 546 (2012) (noting that "the fact that a neutral magistrate has issued a warrant is the clearest indication that the [arresting] officers acted in an objectively reasonable manner"); *Bilida* v. *McCleod*, 211 F. 3d 166, 174–175 (CA1 2000) (Boudin, J.) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists").

For these reasons, we have required plaintiffs pressing such claims to prove the absence of probable cause as a threshold requirement before they can advance their claims under the *Mt. Healthy* framework. We defended this requirement on the assumption that the "existence of probable cause will be at issue in practically all" retaliatory-arrest or retaliatory-prosecution cases given its obvious evidentiary value. *Nieves*, 587 U. S., at 400 (internal quotation marks omitted). Thus, we reasoned that this requirement, which imposes "little or no added cost" on the parties or the court, was a small price to pay for a plaintiff seeking to discard

the presumption of good faith we afford to law-enforcement officials. *Ibid.* (internal quotation marks omitted).

In *Nieves*, however, we recognized a narrow exception to the no-probable-cause rule. While a showing of probable cause generally defeats a retaliatory-arrest claim, we observed that this requirement should be relaxed "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.*, at 406. Concerned that some police officers might exploit the arrest power as a means of suppressing disfavored speech, we explained that the no-probable-cause requirement may be set aside "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*, at 407; cf. *United States* v. *Armstrong*, 517 U. S. 456, 470 (1996).

In recognizing this exception, we emphasized that it is merely a "narrow qualification" to the general rule. *Nieves*, 587 U. S., at 406. And to illustrate the thinness of this exception, *Nieves* offered the example of a vocal critic of the police who is arrested for jaywalking. *Id.*, at 407. The unyielding enforcement of a no-probable-cause requirement in this context would be insufficiently protective of the plaintiff's First Amendment rights because the defendant's animus is a much likelier explanation for such an arrest than the mere existence of probable cause. We chose this example because jaywalking represents the type of relatively benign offense that is "endemic but rarely results in arrest." *Ibid.*

B

Because Gonzalez concedes that her arrest was supported by probable cause, her claim can proceed only if she falls within *Nieves*'s exception.[2] Under this exception, a plaintiff's inability to prove the absence of probable cause is excused only if the plaintiff presents "objective evidence that

─────────
[2] For this reason, I assume for the sake of argument that her alleged conduct constituted a violation of Texas's anti-tampering statute.

he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Ibid.*

The Court is correct to note that a plaintiff must provide objective evidence to fall within the *Nieves* exception. We enforce this requirement to avoid "the significant problems that would arise from reviewing police conduct under a purely subjective standard." *Ibid.*; see also *Horton* v. *California*, 496 U. S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer"). For that reason, evidence regarding an officer's state of mind—*e. g.*, evidence of bad blood between the officer and the plaintiff or allegations that the officer harbored animus—does not qualify.

The defendants argue that permitting anything other than the kind of strict comparator evidence demanded by the Fifth Circuit will defeat the whole purpose of the no-probable-cause rule. Our decisions reflect our sensitivity to these concerns, see *Lozman* v. *Riviera Beach*, 585 U. S. 87, 98 (2018), but a proper application of the *Nieves* exception will not produce this result for at least two reasons.

First, courts must remember that the exception is just that—an exception, and a narrow one at that. Judges should not conflate the question whether certain evidence can be considered under the *Nieves* exception with the entirely distinct question whether the evidence suffices to satisfy this threshold inquiry. We have long recognized "[t]he deep-rooted nature of law-enforcement discretion," *Castle Rock* v. *Gonzales*, 545 U. S. 748, 761 (2005), and a plaintiff therefore must surmount a very high bar when the official can point to the existence of probable cause underpinning an arrest. The example in *Nieves* of a police officer arresting a vocal critic for jaywalking serves as a helpful benchmark for courts and litigants. A plaintiff may satisfy the *Nieves* exception only by providing comparably powerful evidence.

Second, evidence that tends to show only that the plaintiff's constitutionally protected speech was a "substantial or motivating factor" behind the adverse action should not be considered unless and until the plaintiff can provide other evidence to satisfy the *Nieves* exception. *Lozman*, 585 U. S., at 97. This requirement flows from the recognition that the *Nieves* exception serves only as a gateway to the *Mt. Healthy* framework. The *Nieves* exception asks whether the plaintiff engaged in the type of conduct that is unlikely to result in arrest or prosecution. By contrast, the *Mt. Healthy* inquiry is keyed toward whether the defendant's adverse decision was influenced by the plaintiff's constitutionally protected speech.

To see how these principles operate in practice, consider the following hypothetical. Suppose a plaintiff charged with a particular crime brings three pieces of evidence. First, he proffers an affidavit from an officer testifying that no one has been prosecuted in the jurisdiction for engaging in similar conduct. Second, he produces a statistical study corroborating the affidavit. And third, the plaintiff testifies that a police officer has been surveilling his house for several weeks. The first two pieces of evidence count toward the *Nieves* exception, but the third piece of evidence does not. Instead, the third piece of evidence can be considered only after his claim advances to the *Mt. Healthy* framework. Any other approach would render the *Mt. Healthy* framework redundant in most, if not all, cases.

In *Nieves*, three Justices dissented at least in part and would have permitted plaintiffs in cases with probable cause to proceed to trial if they were able to survive summary judgment under *Mt. Healthy*. They argued their positions forcefully and well, but it is not faithful to our precedent to use the "narrow" *Nieves* exception as a crowbar for overturning the core of that decision's holding, supported by six Justices—namely, that the existence of probable cause either always or nearly always precludes a suit like this one.

I now turn to the facts of Gonzalez's case. Here, her evidence is of the type that plaintiffs can use in making out their case under the *Nieves* exception. I agree with the Court that a plaintiff does not need to identify another person who was not arrested under the same law for engaging in a carbon-copy course of conduct. Our jaywalking example in *Nieves* plainly proves this point. We did not suggest that a vocal critic of the police charged with jaywalking had to produce evidence that police officers knowingly refused to arrest other specific jaywalkers. And we certainly did not suggest that this jaywalker had to find others who committed the offense under the same conditions as those in his case—for example, on a street with the same amount of traffic traveling at the same speed within a certain distance from a crosswalk at the same time of day.

On remand, the Fifth Circuit must determine whether Gonzalez's survey is enough for her claim to advance to the *Mt. Healthy* framework. The *Nieves* exception is most easily satisfied by strong affirmative evidence that the defendant let other individuals off the hook for comparable behavior. But when a plaintiff's claim hinges on negative evidence, like what Gonzalez offers here, context is key for determining the strength of his case. When a plaintiff's alleged criminal conduct is egregious or novel, for instance, the lack of similar arrests might warrant little weight. Courts must also ensure that they are assessing the plaintiff's conduct at the appropriate level of generality because every arrest, if defined too specifically, can be described as the first of its kind. If a plaintiff could evade the no-probable-cause requirement simply by submitting evidence that no one who engaged in an exact duplicate of his behavior had been arrested, courts will be "flooded with dubious retaliatory arrest suits," *Lozman*, 585 U. S., at 98, and the *Nieves*'s exception would drain the no-probable-cause requirement of all force.

C

We also granted certiorari on whether the *Nieves* no-probable-cause rule applies beyond split-second arrests. The parties vigorously contested this question in briefing and at oral argument, yet the Court today reserves judgment on this issue. I disagree with this course. In my view, *Nieves* already answered this question in the affirmative after faithfully applying our precedents.

Nothing about *Nieves*'s rationale depends on whether the officer made a split-second arrest of the plaintiff.[3] That decision expressly borrowed the no-probable-cause rule and its underlying justifications from *Hartman*, the seminal case governing retaliatory-prosecution claims. *Nieves* self-consciously emulated *Hartman* because both types of retaliation claims share the same critical characteristics.

Three features stand out. For one thing, courts adjudicating either claim face the "ultimate problem" of determining "whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." *Nieves*, 587 U. S., at 402; see also *Hartman*, 547 U. S., at 265. The causal challenge is similarly complex in both contexts because "protected speech is often a 'wholly legitimate consideration'" for officers deciding whether to launch a prosecution or to make an arrest. *Nieves*, 587 U. S., at 401. For another, with or without the no-probable-cause rule, the presence or absence of probable cause plays a similarly vital role in both retaliatory-arrest and retaliatory-prosecution cases. That is because "'evidence of the presence or absence of probable cause . . . will be available in virtually every'" retaliatory-prosecution or retaliatory-arrest case and because such evidence speaks vol-

---

[3] Indeed, the plaintiff in *Nieves* implied that the officer held a grudge against him before he even had an opportunity to take the plaintiff into custody. See 587 U. S., at 396–397.

umes about the objective reasonableness of a defendant's action. *Ibid.*; see also *Hartman*, 547 U. S., at 265. Lastly, by focusing the inquiry on objective indicia of reasonableness, a no-probable-cause rule reflects our general reluctance to probe the subjective intent of law-enforcement officers. *Nieves*, 587 U. S., at 403; see also *Hartman*, 547 U. S., at 263–265.

This analysis—none of which turns on whether an arrest was made in a split-second context—is plainly incompatible with Gonzalez's theory. And it would be bizarre to think *Nieves* silently limited itself to split-second decisions when the reasoning it imported came from the retaliatory-prosecution context, which by definition involves only deliberative government acts.[4]

Gonzalez argues that we should limit *Nieves* to split-second cases because, in her view, a retaliatory-arrest claim is analogous to the common-law tort of abuse of process, which lacks a no-probable-cause requirement. Tr. of Oral Arg. 5–6. She urges us to rely on the abuse-of-process analogy to draw a line between split-second arrests with no process and arrests pursuant to process that can be likened to the common-law tort. *Ibid.*

Gonzalez's appeal to the common law is wrong twice over. To start, she is wrong to suggest that the abuse-of-process tort was somehow not before us when we decided *Nieves*. Our prior decision in *Hartman* gave full consideration to whether abuse of process was the appropriate analog for a retaliatory-prosecution claim. See 547 U. S., at 258 (noting

---

[4] It is certainly true that we made a fleeting reference to split-second arrests in *Nieves*. Specifically, we mentioned that officers often must make quick, difficult assessments of a potential arrestee's conduct and speech to determine whether the subject poses a threat. 587 U. S., at 401. But we offered that observation as an additional justification for the no-probable-cause rule rather than as a limit on the rule's applicability. The "*ultimate* problem" remains the difficulty of figuring out whether the arrest was motivated by "the officer's malice or the plaintiff's potentially criminal conduct." *Id.*, at 402 (emphasis added).

that "we could debate whether the closer common-law analog to retaliatory prosecution is malicious prosecution (with its no-probable-cause element) or abuse of process (without it)"). By holding that such a claim requires a plaintiff to prove there was no probable cause for the charge, *Hartman* necessarily rejected the force of any analogy to abuse of process. In *Nieves*, the core dispute was whether we should extend the same no-probable-cause requirement to retaliatory-arrest claims. Once we decided to do so, we copied *Hartman*'s reasoning. It is therefore quite clear that the *Nieves* Court was aware of the abuse-of-process tort, as well as the argument that this tort should govern our decision. And if we needed any reminding, the United States argued in *Nieves* that "[a] retaliatory-arrest claim is not analogous to the tort of abuse of process." Brief for United States as *Amicus Curiae* in *Nieves* v. *Bartlett*, O. T. 2018, No. 17–1174, p. 10, n. 2.

Gonzalez's common-law argument suffers from another defect. It is well settled that common-law principles are meant to serve as helpful guides rather than prefabricated components of a 42 U. S. C. § 1983 claim. *Manuel* v. *Joliet*, 580 U. S. 357, 370 (2017); see also *Rehberg* v. *Paulk*, 566 U. S. 356, 366 (2012) ("[T]he Court has not suggested that § 1983 is simply a federalized amalgamation of pre-existing common-law claims"). At the end of the day, none of our decisions in this area has unthinkingly outsourced our analysis to the common law of torts. In *Hartman*, for instance, we expressly declined the parties' "invitation to rely on common-law parallels," and never took a position on whether malicious prosecution or abuse of process was the better analog to retaliatory prosecution. 547 U. S., at 258. And in *Nieves*, we looked to the common law only to "confir[m]" what we had already concluded: that the same no-probable-cause requirement we established in *Hartman* should also apply to retaliatory-arrest claims. 587 U. S., at 405. Common-law torts can assist our analysis, but they do not dictate every dimension of a § 1983 claim.

And that is for good reason. Many § 1983 claims "can be favorably analogized to more than one of the ancient common-law forms of action." *Wilson* v. *Garcia*, 471 U. S. 261, 272–273 (1985). Because any analogy to a common-law cause of action is thus "bound to be imperfect," *id.*, at 272, we necessarily deal in generalities when we look to the common law to define § 1983 claims.[5] The specific facts of a given case might align more or less well with the chosen common-law analog, but until today no one has suggested that our jurisprudence requires courts to toggle between different tort analogies within the same class of § 1983 claims. Consider the parties' arguments in *Hartman*. The defendants urged us to analogize retaliatory-prosecution claims to the malicious-prosecution tort, while the plaintiff suggested that abuse of process might be the more apt analog. Brief for Petitioners 25–30 and Brief for Respondent 41–42 in *Hartman* v. *Moore*, O. T. 2005, No. 04–1495. But neither party asked us to adopt the malicious-prosecution analogy for some § 1983 retaliatory-prosecution claims while relying on the abuse-of-process analogy for others.

Gonzalez, by contrast, invites us to slice and dice every complaint alleging a retaliatory-arrest claim based on a quick skim of the facts at the motion-to-dismiss stage. Under her view, the elements of a plaintiff's meritorious § 1983 claim may evolve throughout the lawsuit as more facts are discovered and verified. I see little value in endorsing this awkward and predictably inefficient innovation.

Gonzalez's proposed limit on *Nieves* would also be unworkable in practice because it raises thorny line-drawing questions about the meaning of a "split-second" decision to arrest. Consider an officer who surveils a political dissident for many months with the plan of arresting him the moment he broke

---

[5] First Amendment retaliation claims offer a particularly good example of this point. JUSTICE THOMAS's dissent in this case shows, at a minimum, that there are strong reasons to suspect that the abuse-of-process tort is an inferior analog compared to the torts of false imprisonment, malicious arrest, and malicious prosecution. See *post*, at 676–679.

the law. Would that arrest be considered a split-second decision under Gonzalez's view? Or suppose that an arresting officer takes several minutes to confer with another officer on the scene. Would the no-probable-cause requirement apply? What if an officer takes time to ensure that everyone at a crime scene is safe before completing an arrest? These hypotheticals illustrate the vast practical difficulties with Gonzalez's theory, and there is no principled basis for drawing such finely grained lines in any event.

A "split-second" rule would also create a perverse incentive for police officers to make quick arrest decisions rather than proceeding in a deliberative manner. Gonzalez's test punishes the city officials for seeking a warrant from a neutral magistrate before arresting her. Under her approach, the defendants would have been better off if they had arrested her immediately. I see no good reason to switch out *Nieves* for a novel doctrinal dichotomy that generates such counterintuitive results.

In sum, *Nieves* applies to *all* retaliatory-arrest claims brought under §1983. And that decision means what it says. "[P]robable cause should generally defeat a retaliatory arrest claim," and a plaintiff bringing such a claim "must plead and prove the absence of probable cause for the arrest" unless he can fit within its narrow exception. 587 U. S., at 402, 406. Nothing in the Court's decision today should be understood as casting doubt on this holding.

## III

With these observations, I join the Court's opinion.

JUSTICE KAVANAUGH, concurring.

Sylvia Gonzalez was arrested for intentionally stealing a government record. See Tex. Penal Code Ann. §37.10(a)(3) (West Cum. Supp. 2023). Gonzalez sued city officials under 42 U. S. C. §1983, alleging that she was arrested in retaliation for First Amendment-protected activity.

But Gonzalez conceded that city officials had probable cause to arrest her for intentionally removing the government record. (A video shows Gonzalez putting the government record into her binder at a city council meeting. See *ante*, at 659–662 (ALITO, J., concurring).) An arrestee ordinarily cannot sue a public official under §1983 for retaliatory arrest if the official had probable cause to make the arrest. See *Nieves* v. *Bartlett*, 587 U. S. 391, 404 (2019). To somehow maintain her §1983 suit, Gonzalez invoked what is known as the *Nieves* exception. That exception applies when an individual is arrested for minor criminal conduct where officers "typically exercise their discretion not" to arrest. *Id.*, at 406. The prime example is jaywalking. *Id.*, at 407.

To come within the *Nieves* exception, Gonzalez was required to present "objective evidence" that she was arrested when "similarly situated individuals" who engaged in the same *conduct* would not have been arrested. *Ibid.* Of course, Gonzalez could not plausibly claim that people in Texas who steal things (or more precisely here, who steal government records) do not get arrested. Instead, she says that she took the government record accidentally, not intentionally, and that people who accidentally remove government documents are not arrested.

Properly understood, that is not a *Nieves*-exception claim at all. The *Nieves* exception is a conduct-based comparison. Only if the conduct does not usually trigger an arrest under any statute can you have a *Nieves*-exception claim—like jaywalking. Gonzalez's argument turns not on her conduct (taking government records) but rather on her *mens rea*. She essentially argues that an objectively reasonable officer would have known that Gonzalez accidentally rather than intentionally took the government record.

When Gonzalez conceded that the officials had probable cause to arrest her, however, she necessarily conceded that the officers had probable cause to conclude that she "intentionally" removed the document. Tex. Penal Code Ann.

§ 37.10(a)(3).  That may have been an unwise concession.
But it should have foreclosed Gonzalez's attempt to contest
her *mens rea* for purposes of her § 1983 retaliatory arrest
claim.  And even if Gonzalez had not made the concession,
the question here would be whether an objectively reason-
able officer would have known that Gonzalez accidentally
(rather than intentionally) took the document.  In short, this
is (at most) a case about probable cause as to *mens rea*, not
about conduct-based comparisons.  This case has nothing to
do with the *Nieves* exception.

At this point, the Court's grant of certiorari looks ill-
advised given that the question presented about the *Nieves*
exception bears no relation to the issue on which Gonzalez's
suit actually turns.  In any event, we are where we are.  I
concur in the *per curiam* because the *per curiam* does not
seem to say anything that is harmful to the law, even though
the *per curiam* (in my view) does not really have anything
to do with Gonzalez's case.

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins,
concurring.

Today, the Court rightly recognizes that petitioner Sylvia
Gonzalez's survey—showing that, in the last decade, no one
charged with the crime for which she was arrested had en-
gaged in conduct similar to hers—is objective evidence ad-
missible to prove that she "was arrested when otherwise
similarly situated individuals not engaged in the same sort
of protected speech had not been."  *Nieves* v. *Bartlett*, 587
U. S. 391, 407 (2019); see *ante*, at 658.

That recognition, however, should not be taken to suggest
that plaintiffs cannot use *other* types of objective evidence
to make this showing.  The *Nieves* exception is satisfied in
"circumstances where officers have probable cause to make
arrests, but typically exercise their discretion not to do so."
587 U. S., at 406.  "The only express limit we placed on the
sort of evidence a plaintiff may present for that purpose is

that it must be objective." *Ante,* at 658. As the United States explains, such objective evidence could "include officers' employment of an unusual, irregular, or unnecessarily onerous arrest procedure," as well as "[t]he timing of and events leading up to a plaintiff's arrest." Brief for United States as *Amicus Curiae* 20.\* Similarly, "if officers falsely document the arrest or include other indicia of retaliatory motive in arrest-related documents, that too might suggest meaningfully differential treatment." *Id.,* at 21.

Here, in addition to her survey, Gonzalez presented this other kind of evidence as well. Before the District Court, Gonzalez pointed to, among other things, details about the anomalous procedures used for her arrest and statements in the arresting officer's warrant affidavit suggesting a retaliatory motive. See Brief for Petitioner 43–44. Those categories of evidence, too, can support the conclusion that Gonzalez "was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves,* 587 U. S., at 407. On remand, the lower courts may consider the full scope of objective evidence that Gonzalez has offered to establish differential treatment. See *ante,* at 658.

With this understanding, I join the Court's *per curiam* opinion.

Justice Thomas, dissenting.

I continue to believe that "plaintiffs bringing a First Amendment retaliatory-arrest claim under §1983 should have to plead and prove a lack of probable cause." *Lozman*

---

\*Justice Alito suggests that evidence of this sort—such as the fact that "a police officer has been surveilling [a plaintiff's] house for several weeks"—would not "count toward the *Nieves* exception." *Ante,* at 667 (concurring opinion). He does not explain, however, why such evidence would not be objective, or why such evidence would not be relevant to proving that a plaintiff "was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves,* 587 U. S., at 407.

v. *Riviera Beach*, 585 U. S. 87, 107 (2018) (THOMAS, J., dissenting).\* Under the Court's precedents, 42 U. S. C. § 1983 is "construed in light of common-law principles that were well settled at the time of its enactment." *Kalina* v. *Fletcher*, 522 U. S. 118, 123 (1997). "Because no common-law tort for retaliatory arrest in violation of the freedom of speech existed when § 1983 was enacted, we look to the common-law torts that provide the closest analogy to this claim." *Nieves* v. *Bartlett*, 587 U. S. 391, 409 (2019) (THOMAS, J., concurring in part and concurring in judgment) (internal quotation marks and alteration omitted). As I have previously explained, the common-law torts most analogous to retaliatory-arrest claims are false imprisonment, malicious arrest, and malicious prosecution—all of which required a plaintiff to prove "the absence of probable cause." *Id.*, at 409–410. Gonzalez concedes that there was probable cause for her arrest. Brief for Petitioner 30. Her retaliatory-arrest claim therefore cannot proceed.

Resisting that conclusion, Gonzalez contends that there is still another common-law analogue for a retaliatory-arrest claim: abuse of process. Although the exact contours of that tort are unclear, abuse of process generally addressed the "extortionate perversion of lawfully initiated process to illegitimate ends." *Heck* v. *Humphrey*, 512 U. S. 477, 486, n. 5 (1994). Critically for Gonzalez's argument, an abuse-of-process claim did not require a plaintiff to establish the absence of probable cause. See C. Addison, Wrongs and Their Remedies 601–602 (3d ed. 1870) (Addison); 1 T. Cooley, Law of Torts 356 (3d ed. 1906) (Cooley).

––––––––––

\*I also remain "skeptical that 42 U. S. C. § 1983 recognizes a claim for retaliatory arrests under the First Amendment." *Lozman*, 585 U. S., at 104, n. 2 (THOMAS, J., dissenting). "Because no party questions whether § 1983 claims for retaliatory arrests under the First Amendment are actionable, I assume that § 1983 permits such claims." *Nieves* v. *Bartlett*, 587 U. S. 391, 409, n. (2019) (THOMAS, J., concurring in part and concurring in judgment).

I am not persuaded that an abuse-of-process claim is analogous to Gonzalez's retaliatory-arrest claim. Gonzalez's central argument is that her arrest was invalid because the defendants had an improper motive. As she sees it, even though the defendants had probable cause to arrest her, they did so only in retaliation for her constitutionally protected speech. See App. to Pet. for Cert. 126a, 129a. Abuse of process, however, appeared to be less concerned with why process was initiated and more with whether process was ultimately used as "intended by the law." *Mayer* v. *Walter*, 64 Pa. 283, 285–286 (1870); see Addison 602 (abuse-of-process tort applies where process has been "prostituted to an illegal purpose"). An abuse of process occurred when an ordinary process was distorted "for a purpose not justified by the law," and the tort required "'an act in the use of the process not proper in the regular prosecution of the proceeding.'" Cooley 354–356. For example, a plaintiff could assert an abuse-of-process claim if an officer arrested and detained him in an oppressive manner as a means of extortion. See *id.*, at 354–355 (providing as an example "causing an arrest . . . and keeping [the plaintiff] imprisoned until, by stress thereof, he is compelled to surrender property to which the other is not entitled"). Or, a plaintiff could bring an abuse-of-process claim if an officer deprived him of food while he was detained. *Wood* v. *Graves*, 144 Mass. 365, 366, 11 N. E. 567, 576 (1887) (describing where a person "arrested . . . is treated with cruelty, is deprived of proper food, or is otherwise treated with oppression and undue hardship"). Either way, the essential question appears to have been how the process was used—not whether the process was initiated with an improper motive. See *Glidewell* v. *Murray-Lacy & Co.*, 124 Va. 563, 569, 98 S. E. 665, 667 (1919) (explaining that the "distinctive nature of an action for abuse of process . . . lies for the improper use of a regularly issued process, not for maliciously causing process to issue"); Cooley 356 ("'Regular and legitimate use of process, though with a bad inten-

tion, is not a malicious abuse of process'"). Because Gonzalez's retaliatory-arrest claim focuses on the motives behind her arrest and not the process itself, the abuse-of-process tort is a poor fit.

The Court takes an even more dubious route in its attempt to salvage Gonzalez's case. In *Nieves* v. *Bartlett*, the Court correctly recognized that probable cause precludes a retaliatory-arrest claim. 587 U. S., at 406. But, it introduced one purportedly "narrow qualification." *Ibid.*; see *Lund* v. *Rockford*, 956 F. 3d 938, 944 (CA7 2020) (considering whether a plaintiff's "case squeeze[d] through the crack of an opening that *Nieves* left ajar"). The *Nieves* Court concluded that a plaintiff need not show a lack of probable cause if he "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." 587 U. S., at 407.

Today, the Court expands that qualification. *Nieves*'s exception can now apply if a plaintiff presents evidence of *any* objective fact that "makes it more likely that an officer has declined to arrest someone for engaging in such conduct in the past." *Ante*, at 658 (emphasis deleted). Accordingly, even though Gonzalez's proffered evidence does not point to a single "similarly situated individua[l]," the Court nonetheless concludes she may satisfy the *Nieves* exception. *Nieves*, 587 U. S., at 407.

There is "no basis in either the common law or our First Amendment precedents" for the exception created in *Nieves* and expanded upon today. *Id.*, at 409 (opinion of THOMAS, J.). And, the Court should not craft § 1983 rules "as a matter of policy." *Id.*, at 411. I would adhere to the only rule grounded in history: Probable cause defeats a retaliatory-arrest claim. I respectfully dissent.

---

Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None

---