RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0108p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

SONYA KENETTE BROWN,

                *Plaintiff-Appellant*,

    *v.*

CITY OF ALBION, MICHIGAN; ALBERT SMITH, GLENIANE REID, and SHANE WILLIAMSON, individually and in their official capacities as City Council Members for the City of Albion; DAVID ATCHISON, individually and in his official capacity as the Mayor of the City of Albion; SCOTT KIPP, individually and in his official capacity as Chief of Public Safety for the City of Albion; JASON KERN, individually and in his official capacity as the Deputy Chief of Public Safety for the City of Albion; CULLEN CHRISTOPHER HARKNESS, individually and in his official capacity as City Attorney for the City of Albion; NICOLE WYGANT, individually and in her official capacity as Detective/Sergeant for the City of Albion Department of Public Safety,

                *Defendants-Appellees*.

> No. 24-1522

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cv-01240—Hala Y. Jarbou, District Judge.

Argued: March 18, 2025

Decided and Filed: April 29, 2025

Before: COLE, STRANCH, and READLER, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Eric J. Sheppard, Okemos, Michigan, for Appellant. Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees. **ON BRIEF:** Eric J. Sheppard, Okemos, Michigan, for Appellant. Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees.

_____

**OPINION**

_____

JANE B. STRANCH, Circuit Judge. Sonya Kenette Brown was a City Council member in the City of Albion, Michigan. She was prosecuted for violating a provision in the City Charter prohibiting City Council members from directing the appointment or removal of any administrative officer or employee of the city. She alleges that her political opponents on the City Council engaged in retaliatory prosecution and arrest, malicious prosecution, and conspiracy to violate her civil rights, and she alleges that the relevant provision of the City Charter is unconstitutional. The district court dismissed her claims alleging retaliatory prosecution and arrest, malicious prosecution, and conspiracy to violate civil rights and granted summary judgment to the Defendants on her claim that the City Charter provision was unconstitutional. She now appeals those decisions. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Factual Background

This case stems from a deeply acrimonious relationship between Brown and several other members of Albion City government. The facts alleged in Brown's Complaint and related documents are as follows. In November 2016, Brown was elected to serve a four-year term as a City Council member for the City of Albion. Defendants David Atchison, Gleniane Reid, Albert Smith, and Shane Williamson were also City Council members at various times throughout Brown's political career. Defendants Scott Kipp (Chief), Jason Kern (Deputy Chief), and Nicole

Wygant (Detective) were officers in the City's Department of Public Safety. Defendant Cullen Harkness was the City Attorney. This was a turbulent time in local politics, and Brown had political disputes with multiple City Council members, including Atchison and Williamson. Initially, these included policy disputes over equitable economic development. In 2018, however, the Mayor, Garrett Brown (no relation to the plaintiff), was involved in a public dispute with his City Manager, Sheryl Mitchell, that culminated in Mitchell's resignation. Mitchell spoke negatively online about members of Albion City government on several occasions after her termination, and Atchison began campaigning against Mayor Brown in a recall election. After Mitchell resigned, Defendant Kipp became interim City Manager, until he was replaced in October 2018 by Latonya Rufus.

In October 2018, Brown, Mayor Brown, and Rufus started a Facebook Messenger group chat, which they used for both text messaging and audio calls. In the text messages, they routinely discussed the political happenings in the City. For example, they complained about Sheryl Mitchell's online commentary against Mayor Brown and Rufus. In November 2018, they shared messages expressing displeasure with Defendant Scott Kipp, who Brown and Rufus believed to be politically aligned with Mitchell.

On November 9, 2018, Rufus complained that Kipp was still sending emails with "Interim City Manager" in his signature line, although he had already been replaced by Rufus. The following conversation ensued:

> Rufus:  Y would he send that[?]
> Brown:  We got u[,] Ms. Rufus! [emoji]
> Brown:  Crazy and wishful thinking…
> Mayor Brown:  The [emojis] were directed at Scott[.]
> Brown:  Get rid of him!  He's untrustworthy[.]

R. 2, Ex. 1, PageID 103–04. Brown then sent two screenshots of emails in which Kipp justified his continued use of the "Interim City Manager" title. The conversation continued:

> Rufus:  BS[.]
> Brown:  [emoji]
> Brown:  Isn't the personal phone bill enough to terminate Scott?

Brown:  And Corisha?

Brown:  Has the labor atty responded to your inquiry?

Rufus:  Not yet[.]

Rufus:  I'm just upset at the mess[.]

Brown:  Scott needs to go, Ms. Rufus.  One less worry!

Brown:  He knew he wasn't paying his bill!!  And he should've known about Carisha!  That's bs[.]

Brown:  Sheryl is gone and there's a new Sheriff in town! [emoji]

R. 2, PageID 104–05.  By Brown's own acknowledgment, this was a "reminder that City Manager LaTonya Rufus was the person that had administrative authority over personnel, including terminating employees that are insubordinate and/or in debt to the City of Albion." R. 1, Compl., PageID 41.  Similarly, on November 30, 2018, Brown once again raised the possibility of action against Kipp, writing "Ms. Rufus, please call Cullen.  He's a snake but he is not going to risk losing his license for Kipp, Sheryl, or anybody else.  He will give you your legal options on dealing with Kipp." R. 2, Ex. 1, PageID 112.

In January 2019, the City Council placed Rufus on administrative leave and began investigating allegations that she embezzled the City's funds.  Rufus eventually pled guilty to misdemeanor embezzlement.  As part of that investigation, Harkness, the City Attorney, directed Kipp, in his capacity as the Chief of Public Safety, to confiscate Rufus's city-issued cell phone and laptop and to attempt to recover any deleted messages.  Kipp recovered the messages between Rufus, Brown, and Mayor Brown described above.  Upon seeing the messages, Defendant Smith filed a recall petition against Brown, alleging that Brown had violated the City Charter, which prohibits City Council members from directing the termination of any city employee.  He later withdrew the petition, but the messages got leaked to a local news website.  As a result of the publicized messages, a local resident filed a second recall petition against Brown for violation of the City Charter using identical language to that used by Smith.  This time, the recall was successful, and, on November 8, 2019, Brown was voted out of office.

In the interim between the leak of the Facebook messages and the recall election, Brown filed a complaint with the Michigan State Police and the Michigan Attorney General's Office

alleging that Kipp had unlawfully accessed the messages on Rufus's phone.  She also complained about the search at a public City Council meeting on March 1.  On August 13, 2019, Kipp lodged a complaint with the City, alleging that Brown was harassing and defaming him.

After Brown was voted off the council, the City Council hired outside counsel to investigate Brown's behavior.  Counsel advised that, while Brown had not harassed Kipp, she had violated the City Charter by sending the text messages regarding Kipp.  Defendants Smith, Reid, Williamson, and Atchison then voted to hire a special prosecutor to criminally prosecute Brown.  Once they had done so, Harkness, acting on the direction of the special prosecutor, asked Wygant, in her role as Detective Sergeant, to generate a police report incident number about the alleged violation.  In June 2020, the special counsel signed a misdemeanor complaint against Brown.  Wygant generated an arrest warrant and swore out a warrant affidavit, a magistrate judge authorized the warrant, and Brown was charged with violation of the City Charter.  Ultimately, a jury found Brown not guilty of the charges against her.

## B. The City of Albion Charter

Two portions of the City Charter are relevant to this appeal.  First, § 5.8(a) of the City Charter provides, "The council members shall not individually direct the appointment or removal of any administrative officer or employee of the City and shall deal with the administrative service of the City only through the City Manager, as to officers and employees made responsible to him."  Albion, Mich., Charter § 5.8.  This is the section of the City Charter that Brown was alleged to have violated in her texts with Rufus.

Second, § 2.5 of the charter sets forth criminal penalties for violations of the charter.  It reads as follows:

> Any person found guilty of an act constituting a violation of this charter may be punished by a fine which, in addition to court costs charged to him, shall not exceed five hundred dollars ($500.00) or imprisonment for not more than ninety (90) days, or by both such fine and imprisonment, in the discretion of the court. This section shall not operate to limit or prejudice the power to remove officers or discharge employees as provided in this charter.

*Id.* § 2.5.

## C. Procedural History

Brown's Complaint in this case raises several dozen claims, many of which are not relevant to this appeal. Most of Brown's claims were dismissed as time barred, as insufficiently pled, or for lack of standing, and Brown does not appeal those decisions. Brown's claims relevant to this appeal are:

(A) Claims for retaliatory arrest alleging that her arrest was retaliation for First Amendment protected speech in her Facebook messages and for her public complaints about the search of LaTonya Rufus's phone;

(B) Claims for retaliatory prosecution alleging that her prosecution was retaliation for the same conduct;

(C) A claim of malicious prosecution;

(D) A claim of conspiracy against the many Defendants alleged to have deprived Brown of her civil rights via retaliatory and malicious prosecution; and

(E) A claim of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against the City for enforcing § 5.8 of the City Charter—which Brown alleges is unconstitutionally vague and overbroad—against her.

The district court dismissed the retaliatory arrest, retaliatory prosecution, malicious prosecution, and conspiracy claims because all of those claims require that the plaintiff allege an absence of probable cause. The district court found that, even based solely on the pleadings, it was apparent that there was probable cause, because the Facebook messages—screenshots of which Brown attached to the Complaint—created probable cause for the city officials to believe that she had violated the City Charter. The district court held that Brown's *Monell* claim survived a motion to dismiss, but then granted summary judgment in favor of the Defendants, holding that § 5.8 of the City Charter is neither unconstitutionally vague nor unconstitutionally overbroad. Brown appeals these decisions.

## II. ANALYSIS

## A. Claims Dismissed Under Rule 12(b)(6)

We review de novo the district court's order of dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Jones v. City of Cincinnati*, 521 F.3d 555, 559

(6th Cir. 2008).  "We construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382–83 (6th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)).

To state a claim for First Amendment retaliation, the complaint must allege that "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  Where the alleged adverse action consists of a criminal prosecution, the plaintiff must plead the absence of probable cause.  *Hartman v. Moore*, 547 U.S. 250, 265–66 (2006).  Where the adverse action consists of an arrest, the plaintiff generally must plead the absence of probable cause, but as discussed below, there are exceptions to this requirement. *Nieves v. Bartlett*, 587 U.S. 391, 401–02 (2019).

To state a claim for malicious prosecution, the complaint must allege that (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty as a consequence of the legal proceeding; and (4) the criminal proceeding was eventually resolved in the plaintiff's favor.  *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010).

To state a claim for conspiracy to violate civil rights, the plaintiff must plead that (1) a plan existed; (2) the conspirators in the plan shared an objective to deprive the plaintiff of his or her constitutional rights; and (3) an overt act was committed in furtherance of the conspiracy that caused the plaintiff's injury.  *Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019). Here, because the only violations of her constitutional rights that Brown alleges as part of the conspiracy are retaliatory and malicious prosecution, the conspiracy claim will rise and fall with those claims.

Typically speaking, therefore, all of these claims require Brown to plead an absence of probable cause to support her prosecution for violation of the City Charter. Brown does not resist this conclusion with regard to her retaliatory prosecution, malicious prosecution, and conspiracy claims. However, she argues that her retaliatory arrest claims fall within several exceptions to the requirement that she demonstrate an absence of probable cause. And, in any case, she argues that there was an absence of probable cause.

### 1. Exceptions to the Probable Cause Pleading Requirement

Brown raises two potential exceptions to the requirement that a plaintiff plead the absence of probable cause in a retaliatory arrest case. First, in the "unique class of retaliatory arrest claims" premised on "objective evidence" of a premeditated municipal policy to retaliate or intimidate the plaintiff by arresting her for conduct unrelated to her protected activity, the plaintiff is not required to plead the absence of probable cause. *Lozman v. City of Riviera Beach*, 585 U.S. 87, 99–101 (2018). Second, the requirement to plead the absence of probable cause for retaliatory arrest claims does not apply when "a plaintiff presents objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407.

### a. *The* Lozman *Exception*

In *Lozman*, the plaintiff was an outspoken critic of city policy and often spoke at city council meetings. 585 U.S. at 91. He filed a lawsuit alleging that those same council meetings violated Florida's open meeting laws. *Id.* In a closed-door meeting about that lawsuit, city council officials allegedly reached a consensus to use city resources to intimidate Lozman. *Id.* When Lozman spoke at another meeting, a city council member directed him to stop speaking and, when he refused, directed an officer to arrest him. *Id.* at 92. It was undisputed by the time of the Supreme Court's consideration that there was probable cause to arrest Lozman for violating a public-disturbance statute at the meeting. *Id.* at 93, 95.

The Court held that Lozman was not required to plead an absence of probable cause on that record, but, instead, could plead that his speech was a but-for cause of his arrest. *Id.* at 96, 101 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87 (1977)).

The Court did so for several reasons.  First and foremost, Lozman had pled "more governmental action than simply an arrest."  *Id.* at 99.  He had pled that there was "an 'official municipal policy' of intimidation" carried out by the City through its legislators with a premeditated plan to retaliate for his prior speech.  *Id.* at 99–100 (citing *Monell*, 436 U.S. at 691).  This "objective evidence of a policy motivated by retaliation" was crucial to the outcome because:

> An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer.  An official policy also can be difficult to dislodge.  A citizen who suffers retaliation by an individual officer can seek to have the officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation.  For these reasons, when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress.

*Id.* at 100.

Second, the speech for which the City retaliated bore little relation to the offense for which Lozman was arrested, "alleviat[ing] the problems" with proving "causation in arrest cases" that might otherwise arise.  *Id.*  The Court noted that, ordinarily, the contents of the suspect's speech can be a valid consideration in determining whether to arrest the suspect, making it "difficult to discern whether an arrest was caused by the officer's legitimate or illegitimate consideration of speech."  *Id.* at 98 (citing *Reichle v. Howard*, 566 U.S. 658, 668 (2012)).  Thus, ordinarily, a requirement that the plaintiff prove the absence of probable cause (thereby demonstrating that even legitimate reliance on speech did not justify arrest) is preferable.  *Id.*  But, in *Lozman*, the speech at issue had nothing to do with the crime for which Lozman was arrested and had occurred "months earlier," so there was no need to discern between legitimate and illegitimate consideration of speech, and the probable cause requirement was not necessary.  *Id.* at 100.

The *Lozman* Court explained that "Lozman's claim is far afield from the typical retaliatory arrest claim," and it tied its holding to cases that fell in the "unique class of retaliatory arrest claims" factually similar to *Lozman*.  *Id.* at 99–101 ("On facts like these, *Mt. Healthy* provides the correct standard for assessing a retaliatory arrest claim.").  The Court explicitly

declined to extend its holding to address the elements required to plead a retaliatory arrest claim where facts like the ones described above were not present. *Id.* at 101.

This record does not present either of the key circumstances relied upon by the Court in *Lozman* or circumstances sufficiently analogous to permit an appropriate extension of *Lozman*. Brown does not directly allege, or allege any facts to suggest, that there was an official policy of retaliation. Brown points to the City Council's vote to hire a special prosecutor and argues that the vote was tantamount to a policy of retaliation. Yet Brown did not allege that City Council members suggested intimidating Brown or engaging in political retribution. She does not suggest that the decision to prosecute was made as part of a general discussion about the political or personal implications of her speech. Instead, that decision was undisputedly made at a meeting set to discuss the allegedly criminal nature of Brown's conduct after the violation of the City Charter had been brought to the City's attention by an outside attorney. Indeed, even at that meeting, the City Council did not directly order Brown's arrest or prosecution; instead, they voted to hire a special prosecutor who made the arrest decisions on his own. Brown has not, therefore, alleged an official policy of retaliation by the legislators. Nor has she presented objective evidence to that end as Lozman did.

Further, unlike in *Lozman*, Brown's arrest was based on the same speech for which the City Council allegedly retaliated. There was legitimate consideration of the Facebook messages as part of the arrest decision because they were the factual predicate for the arrest. As a result, a court reviewing arrest decisions based on the Facebook messages would need to "discern whether [the] arrest was caused by the [city official's] legitimate or illegitimate consideration of speech." *See id.* at 98. As discussed above, *Lozman* applies only where such discernment is not necessary because the basis for the arrest has little to do with and is temporally removed from the speech for which the officials are allegedly retaliating. *Id.* at 100–01. Thus, *Lozman* does not apply on this record.

b. *The* Nieves *Exception*

In *Nieves v. Bartlett*, the Supreme Court created another exception to the general requirement that the plaintiff plead a lack of probable cause. 587 U.S. at 406–07.

"Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 406. To plead retaliatory arrest in that context, a plaintiff must present "objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407.

> *Nieves* provides an example:

> [A]t many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest. In such a case . . . probable cause does little to prove or disprove the causal connection between animus and injury[.]

*Id.*

The Supreme Court recently revisited the *Nieves* exception in *Gonzalez v. Trevino*. 602 U.S. 653, 658 (2024) (per curiam). The Court acknowledged that the *Nieves* exception is "narrow" but held that it does not require "virtually identical and identifiable comparators[.]" *Id.* at 655, 658. A plaintiff may demonstrate that comparable crimes were not prosecuted, but may also present other types of evidence to demonstrate that officers typically do not arrest someone for the conduct engaged in by the plaintiff. *Id.* In *Gonzalez*, for instance, the plaintiff presented a survey of criminal charges in the county in which she had been charged and demonstrated that though the statute under which she was charged had been applied hundreds of times, it was never applied to conduct like hers. *Id.* at 657. The Court concluded that "the fact that no one has ever been arrested for engaging in a certain kind of conduct—especially when the criminal prohibition is longstanding and the conduct at issue is not novel—makes it more likely that an officer *has* declined to arrest someone for engaging in such conduct[.]" *Id.* at 658.

We begin by identifying the set of evidence Brown can rely on to demonstrate that comparable crimes are typically not prosecuted. In Brown's Complaint, she does not allege any evidence comparable to the narrow classes of evidence suggested in either *Nieves* or *Gonzalez*.

She does not allege that any other similarly situated individuals were not charged, and she does not provide statistics, or other information about how violations of the City Charter are generally charged. Instead, Brown alleges that "[t]o Plaintiff's knowledge, Section 5.8 has never been used to criminally prosecute anyone in the entire history of the ordinance, which was enacted in 1998, upon information and belief." R. 1, PageID 77. This is the only reference to prior charging patterns under the City Charter in Brown's Complaint.

Outside the Complaint, Brown points to an exhibit she attached for the first time to her motion for reconsideration of the district court's order dismissing her Complaint. The attached exhibit is a memorandum Brown allegedly submitted to the City Council in advance of the meeting to discuss the appointment of the special prosecutor after she was voted off the council. R. 59-2, Ex. 2, PageID 614. In the memorandum, she alleges that Williamson and Atchison should also be prosecuted for violation of the City Charter. *Id.* Brown now argues that because no action was taken on this memorandum, Williamson and Atchison are similarly situated comparators who were never arrested.

Regardless of whether this memorandum would be sufficient "objective evidence" under *Gonzalez*, we cannot consider it. On a motion to dismiss, the court is limited to the allegations in the plaintiff's complaint, the exhibits attached to the complaint, public records, and documents in the record to which the complaint refers. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The memorandum does not fall into any of those categories and, therefore, cannot be considered. Thus, the only fact available to Brown in her argument that officers typically exercise their discretion not to arrest individuals for violations of § 5.8 of the City Charter is her allegation that no officer has arrested someone for violation of that provision before. We consider that allegation alone in our evaluation of the applicability of the *Nieves* exception.

Brown argues, relying on *Gonzalez*, that the lack of criminal prosecutions for certain conduct under a longstanding statute is always evidence that officers have declined to prosecute other individuals for similar conduct. This argument relies on an overly broad reading of *Gonzalez*. *Gonzalez* makes the commonsense point that, if a particular type of behavior is common but never charged, officers must be declining to charge it. 602 U.S. at 658. Take the

jaywalking example from *Nieves*.  In a town that never prosecutes jaywalking, one can assume a prosecution for jaywalking is retaliatory because jaywalking happens all the time.  If something happens all the time, and is never charged, officers must be declining to charge it.  If, by contrast, a particular crime is never committed, the fact that it is never charged does not demonstrate that officials are *declining* to charge it.  The majority in *Gonzalez* recognized this, noting that "the fact that no one has ever been arrested for engaging in a certain kind of conduct—especially when the criminal prohibition is longstanding *and the conduct at issue is not novel*—makes it more likely that an officer *has* declined to arrest someone for engaging in such conduct[.]"  *Id.* at 658 (first emphasis added).

The problem for Brown on this record is that it seems likely Brown's conduct was novel. Section 5.8 of the City Charter is a highly specific prohibition that restricts the conduct of a narrow group of people.  By its own terms, it only applies to City Council members, Albion, Mich., Charter § 5.8, and at any given time only six people will hold that role, *id.* § 5.1.  It proscribes a specific act rather than a broad range of conduct.  *Id.* § 5.8.  As a result of the narrow applicability of the statute, there is a significant likelihood that Brown's conduct truly was novel.  The fact that no one has been prosecuted for a violation of § 5.8, therefore, does little, if anything, to suggest that others have violated this same provision and not been charged. Brown does not allege in her Complaint that anyone else had ever violated § 5.8.  And, unlike the jaywalking example where it is common knowledge that jaywalking happens all the time, there is no reason to assume that § 5.8 has been violated absent some allegation that it has. Indeed, based on the documents we can consider at this stage, there is no allegation that anyone has ever violated any portion of the City Charter.  Absent more definitive allegations in the Complaint, the *Nieves* exception does not apply.

### 2. Probable Cause in Brown's Case

As discussed above, given the inapplicability of the *Lozman* and *Nieves* exceptions, all of Brown's claims for retaliatory prosecution and arrest, malicious prosecution, and conspiracy to violate civil rights through retaliatory and malicious prosecution require her to allege an absence of probable cause.  This means that we must determine whether Brown "pleaded allegations plausibly suggesting the 'absence of probable cause' for the charges brought against [her]."

*See Blackwell v. Nocerini*, 123 F.4th 479, 489 (6th Cir. 2024) (quoting *Hartman*, 547 U.S. at 265–66). Probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). It "is not a high bar." *Id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). Brown needed, therefore, to plead allegations plausibly suggesting that the Defendants did not have sufficient evidence, based on her Facebook messages, to raise a substantial chance of criminal activity.

The City Charter makes it a crime to "direct the . . . removal of any administrative officer or employee of the city[.]" Albion, Mich., Charter § 5.8. It is undisputed that Scott Kipp, the subject of Brown's text messages, was an officer or employee of the City. R. 1, PageID 30 ("At all times relevant, Kipp was an agent or employee of City of Albion and acted or failed to act within the scope, course, and authority of his employment."). LaTonya Rufus was the person with the authority to remove Kipp from his position. Brown told Rufus that Kipp "need[ed] to go" and that Rufus should "get rid of him." R. 2, Ex. 1, PageID 103-05.

Even based solely on Brown's pleadings, there was evidence available to the Defendants that this was not merely "blowing off steam" or "express[ing] [her] political opinion" as Brown claims. Appellant's Br. 52–53. Brown explicitly followed up on these messages with questions about whether Rufus had consulted an attorney and garnered sufficient evidence to justify a termination. R. 2, PageID 105, 112. It is, of course, possible that Brown's Facebook messages constituted only informal advice on how Rufus should do her job rather than a directive; but, based on the messages, there was a substantial chance that the repeated instructions to terminate Kipp and the follow up on the logistics of doing so were a directive. *See United States v. Martin*, 289 F.3d 392, 400 (6th Cir. 2002) ("Although innocent explanations for some or all of these facts may exist, this possibility does not render the . . . determination of probable cause invalid."). Therefore, the government officials reading those messages had probable cause to believe Brown had committed a violation of the City Charter. *See Wesby*, 583 U.S. at 57. Based on the Facebook messages attached to the Complaint, it is not plausible to conclude that there was a lack of probable cause, so Brown has not pled facts that plausibly suggest a lack of probable cause. She has failed to meet the required pleading standard. *See Blackwell*, 123 F.4th at 489.

Brown argues that probable cause is an issue of fact for the jury to resolve. It is correct that, where the defendants' theory of probable cause involves material factual disputes, the issue should be sent to a jury. *St. John v. Hickey*, 411 F.3d 762, 769 (6th Cir. 2005), *abrogated on other grounds by Marvin v. City of Taylor*, 509 F.3d 234 (6th Cir. 2007). But where the plaintiff's allegations fail to plausibly suggest the absence of probable cause, dismissal is appropriate. Here, Brown's allegations fail to plausibly suggest that the Defendants lacked probable cause. No jury issue is presented.

Finally, Brown argues that protected speech cannot serve as a basis for a probable cause determination and that, since the sole basis for her arrest and prosecution was her speech in the text messages, there must have been a lack of probable cause. Brown rests on two cases to make this argument: *Sandul v. Larion* and *Leonard v. Robinson*. Appellant's Br. 51 (citing *Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997); *Leonard v. Robinson*, 477 F.3d 347, 358 (6th Cir. 2007)). Neither case supports Brown's argument that no political speech may be the basis of probable cause. Both cases concern instances in which the plaintiff engaged in profane or vulgar speech and was arrested for it. *Sandul*, 119 F.3d at 1252; *Leonard*, 477 F.3d at 351–52. In both cases, we concluded that the plaintiff's speech could not be criminal because any law criminalizing such speech would be unconstitutional. *Sandul*, 119 F.3d at 1254–55; *Leonard*, 477 F.3d at 358–61. Therefore, because there was no valid crime the speech could raise a suspicion of, the speech could not form the basis of a probable cause determination. *Sandul*, 119 F.3d at 1256; *Leonard*, 477 F.3d at 361.

Where, however, a law *permissibly* regulates conduct that may involve speech, "acts are not shielded from regulation" merely because of their expressive content. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992). Where a particular type of conduct is criminalized, and constitutionally so, observation of that conduct, even if through speech, may form the basis of probable cause. *Reichle*, 566 U.S. at 668 (noting that probable cause can be based on "wholly legitimate consideration of speech"). As discussed below, § 5.8 of the Albion City Charter was constitutionally valid. It was, therefore, permissible to rely on Brown's speech as evidence of a violation of the Charter in order to establish probable cause. On this record, taking Brown's Facebook messages into account, there was enough evidence to constitute probable cause.

Therefore, Brown's retaliatory prosecution and arrest, malicious prosecution, and conspiracy to violate civil rights through retaliatory and malicious prosecution claims all fail.

## B. Claims on Summary Judgment

Brown appeals the district court's grant of summary judgment on her municipal liability claim against the City of Albion, in which she contends that the City had an unconstitutional policy embodied in § 5.8 of the City Charter and that the City enforced that policy against her. We review a district court's order granting summary judgment de novo. *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 559 (6th Cir. 2022). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). The court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020).

A plaintiff can succeed in a § 1983 suit against a municipal entity by showing that the City "implement[ed] or execut[ed] a policy statement, ordinance, regulation, or decision" that caused the violation of her constitutional rights. *Monell*, 436 U.S. at 690. There can be no liability for the City without an underlying constitutional violation. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). Here, the alleged constitutional violation is the enforcement of Albion City Charter § 5.8, which Brown alleges is unconstitutionally vague and overbroad.

1. Vagueness

Due process requires a court to hold an ordinance or statute "void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 358–59 (6th Cir. 1998). As the Supreme Court explained in *Grayned v. City of Rockford*,

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws trap the innocent by not

providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

408 U.S. 104, 108 (1972) (footnote omitted). Moreover, where a law implicates speech and, thus, may chill it, vague laws may offend the First Amendment. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).

To succeed on a vagueness claim, a plaintiff must show that the relevant statute "(1) 'fail[s] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize[s] or even encourage[s] arbitrary and discriminatory enforcement.'" *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 894 F.3d 235, 246 (6th Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). When determining whether a law provides a reasonable opportunity to understand its prohibitions, courts begin with the plain text of the statute. *Id.* Courts should not require "mathematical certainty" regarding the precise extent of the statute. *Id.* (quoting *Grayned*, 408 U.S. at 110). And when the common meaning of a term makes clear what conduct is prohibited, failure to further define the term will not render the statute void for vagueness. *Id.* at 247. When the challenged language "'is commonly used in both legal and common parlance,' it often will be 'sufficiently clear so that a reasonable person can understand its meaning.'" *Id.* (quoting *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 798 (6th Cir. 2005)). When determining whether a law invites arbitrary enforcement, the primary question is whether it "provides explicit standards guiding [its] enforcement." *Id.* at 252 (brackets omitted) (quoting *United Food & Com. Workers Union*, 163 F.3d at 359).

The only relevant portion of the code is the first clause of Albion City Charter § 5.8, which provides, "The council members shall not individually direct the appointment or removal of any administrative officer or employee of the city[.]" First, § 5.8 states that it applies to "council members." Council members are defined in § 5.1, which explains, "The council shall consist of the mayor and the six (6) councilmen. . . . One councilman shall be elected from each of the six (6) council districts of the city." Second, § 5.8 states that the act those council members must not take is "direct[ing] the appointment or removal[.]" All of these words have ordinary meanings. Appointment and removal are common terms used throughout any number

of statutes without definition. *See, e.g.*, 5 U.S.C. §§ 2302(a)(2)(A)(i), 2303 (describing prohibited "personnel actions" for government employees and defining the term "personnel action" to include "appointment[s]"); 44 U.S.C. § 3902 (discussing appointment and removal of inspectors general). To "direct" means "to request or enjoin . . . with authority[.]" *Direct*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/direct (last visited Feb 22, 2025).

Finally, § 5.8 states that the individuals the City Council members may not direct the appointment and removal of are "administrative officer[s] or employee[s] of the city[.]" The officers of the City are defined in § 4.1 of the Charter, which reads:

City officers.

(a) The elective officers of the city are the mayor, the six (6) councilmen, and the municipal judge or judges.

(b) The appointive officers of the city are the city manager, the assessor, the finance director, the treasurer, the clerk, the city attorney, the police chief, the fire chief, the health officer and members of city boards.

The term "employee" has a common, ordinary meaning. *Employee*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/employee (last visited Feb 22, 2025) ("one employed by another usually for wages or salary"); *see also Employ*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/employ (last visited Feb 22, 2025) ("to use or engage the services of").

Strung together, § 5.8 instructs that none of the six elected councilmen from the six districts may individually request with authority that any person appoint or remove one of the officers listed in § 4.1 or any other individual whom the City employs. Brown can point to no term in this clause that has an ambiguous meaning. Nor does she suggest some meaning other than the one proposed above. Nor does she indicate that any of those terms leave substantial discretion to the enforcing officers as to who or what might fall into one of the defined categories. The ordinance is not unconstitutionally vague.

2. Overbreadth

A statute is unconstitutionally overbroad under the First Amendment if "it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). The court measures substantiality "relative to the statute's plainly legitimate sweep." *Id.* at 292–93. The first step in the overbreadth analysis is to construe the challenged statute to determine its reach. *Id.* at 293. The second is to determine whether the statute "criminalizes a substantial amount of protected expressive activity." *Id.* at 297.

As the Supreme Court has long made clear, "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Thus, while agreements, conspiracies, and directives are all generally carried out verbally (sometimes entirely so), the First Amendment permits government actors to restrict agreements in restraint of trade, *id.*, to regulate the information communicated in corporate disclosure statements, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57 (1978), to curtail employer retaliation for labor activities, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969), and to prohibit certain types of solicitation, *Ohralik*, 436 U.S. at 457. All of the preceding examples involve speech that is regulated not because of its content, but because of its role in an illegal course of conduct.

The conduct prohibited by § 5.8 of the Albion City Charter is of the same nature as the examples described above. Section 5.8 prohibits a City Council member from engaging in what amounts to an employment action—terminating or directing the termination of an employee. While that conduct is accomplished through speech, it is not protected by the First Amendment. *See Gissel Packing Co.*, 395 U.S. at 618. Brown presents no argument that § 5.8 prohibits anything other than this type of employment action, nor is any other prohibition readily apparent on the face of the statute. As a result, § 5.8 of the Albion City Charter is not unconstitutionally overbroad.

### III. CONCLUSION

For the foregoing reasons, the judgments of the district court are **AFFIRMED**.