RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DANIEL GRADY; SHATINA GRADY,

        *Plaintiffs-Appellees*,

    *v.*

JOHN CRATSENBURG; AUSTIN PEARSON,

        *Defendants-Appellants*.

No. 25-1321

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:22-cv-11142—F. Kay Behm, District Judge.

Argued:  February 4, 2026

Decided and Filed:  March 23, 2026

Before:  COLE, MATHIS, and HERMANDORFER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Amanda Rauh-Bieri, MILLER JOHNSON, Grand Rapids, Michigan, for Appellants.  Trovious Starr, STARR LAW, PLLC, Farmington, Michigan, for Appellees. **ON BRIEF:**  Amanda Rauh-Bieri, Amy E. Murphy, MILLER JOHNSON, Grand Rapids, Michigan, for Appellants.  Trovious Starr, STARR LAW, PLLC, Farmington, Michigan, for Appellees.

───────────────

## OPINION

───────────────

HERMANDORFER, Circuit Judge.  The presence of probable cause generally permits police officers to make arrests.  And as officers perform their duties, speech can play a permissible role in assessing threats and whether conduct is criminal.  At the same time, police cannot use probable cause as a pretext to retaliate against individuals for protected expression.

Retaliatory arrest claims arise at the crossroads of those rules. So they can trigger complex causation disputes—particularly since unlawful motive can be easy to allege and hard to disprove. Yet if left unchecked, protracted, post-arrest litigation risks chilling officers' carrying out of important public-safety functions.

The Supreme Court's retaliatory arrest framework, set out in *Nieves v. Bartlett*, 587 U.S. 391 (2019), seeks to balance those concerns. Under *Nieves*, the presence of probable cause "generally defeat[s]" a First Amendment claim of retaliatory arrest. *Id.* at 406. But there's a "narrow" out: A claim can proceed "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 406-07. This case implicates the scope of that exception.

At issue are officers' arrests of Daniel and Shatina Grady during a late-night shooting investigation outside a Michigan residence. Those arrests came after the Gradys approached officers' investigatory perimeter—set up around a suspected shooter's location—and refused repeated commands to step back while loudly questioning the instructing officers' authority. The district court concluded that the Gradys' conduct gave officers probable cause to arrest them under Michigan law. Yet as the district court saw it, the Gradys' retaliatory arrest claim fell within the *Nieves* exception because other onlookers had not criticized police and were not arrested. And it deemed those onlookers similarly situated to the Gradys even though they stood well outside the officers' perimeter and had not defied officers' commands.

We conclude that the Gradys' cited comparators were not similarly situated for purposes of satisfying the *Nieves* exception. Nor did the Gradys come forward with any other objective evidence sufficient to permit their claim to proceed. So *Nieves*'s general rule—that the presence of probable cause defeats retaliatory arrest claims—governs here. We therefore reverse the district court's contrary decision and remand for further proceedings consistent with this opinion.

I

A

The following facts are undisputed or else taken in favor of the Gradys. Shortly after midnight on May 26, 2020, the Washtenaw County Sheriff's Office received a call of shots fired near Peachcrest Street in Ypsilanti Township, Michigan. Deputy Austin Pearson was among the first to respond. Pearson and another deputy swept the area and located a victim with a gunshot wound in her back. The victim told the officers that her shooter fled into a nearby home: 2714 Peachcrest Street. The victim was unsure whether the shooter remained inside. Pearson called for backup and additional officers, including Sergeant John Cratsenburg, soon arrived. Emergency-medical-services personnel took charge of assisting the victim.

Officers then began efforts to locate the shooter at 2714 Peachcrest. Cratsenburg, as ranking officer, took charge of securing the property. Officers believed the potential shooter might be inside. So Cratsenburg declined to put tape around the property to avoid officers' "standing out" in front of the house. Cratsenburg Bodycam Tr., R.69-2, PageID 1680. Instead, Cratsenburg positioned some officers to form a rudimentary perimeter around the property. Cratsenburg and another officer—Deputy Daniel Buffa—then attempted to "make contact" with the home's occupants. *Id.*

Because the perimeter around 2714 Peachcrest features later, we sketch a fuller picture of it now. The residence at 2714 Peachcrest sits on the south side of the street. To the north, a police cruiser was stationed directly across from the house on the opposite side of the street. Cratsenburg directed two officers to position themselves behind that cruiser. The first lay prone across the car's hood with a rifle trained on the home. The second stayed nearby to provide security because there were civilians in the yard behind them. On the western side of the 2714 Peachcrest property, Pearson and another deputy drew their handguns and took cover behind a vehicle in the home's driveway. To the property's east, a single cruiser was parked in the driveway of the next-door house, 2724 Peachcrest Street; the cruiser was angled with its headlights spotlighting the target home. Cratsenburg later explained that no officer was stationed on that side of the property because he simply "ran out of bodies to work with." Trial Tr. Vol. II,

69-6, PageID 2285.  Finally, an officer was stationed behind the 2714 Peachcrest property to cover any rear escape.

With the property surrounded, Cratsenburg and Buffa made their approach.  They first tried knocking on a side door, but the residents did not respond.  Instead, someone opened a front window through which Buffa engaged a resident.  Cratsenburg stayed back to provide cover.

Moments later, the Gradys arrived.  Unbeknownst to any officer at the time, the Gradys' daughter owned 2714 Peachcrest and the Gradys themselves lived three houses down.  The couple approached the property from its northeastern corner and began video recording using their cell phones.  After proceeding along the sidewalk, the Gradys positioned themselves along the fence line and in front of the cruiser being used to spotlight the 2714 Peachcrest residence.  Their location placed the Gradys within the officers' perimeter around 2714 Peachcrest.

What happened next is captured on officers' bodycam footage.  Shortly after the Gradys' arrival at 2714 Peachcrest, Pearson twice ordered the couple to stay back.  Those commands, all agree, came before either Shatina or Daniel spoke.  The Gradys then informed the officers that they intended to film the scene.  Both Cratsenburg and Pearson affirmed that filming was fine— but only from farther back.  The Gradys refused to retreat.

Roughly three minutes of back-and-forth followed.  To summarize, Cratsenburg and Pearson gave the Gradys over a dozen verbal commands to back up.  And Cratsenburg informed the couple that they would be arrested if they failed to comply with those orders.

Still, the Gradys did not heed officers' commands.  They instead repeatedly insisted that they did not have to move.  Shatina raised her voice to question the officers' authority, asked whether they had a warrant, stated the constitutional requirements surrounding warrants, and demanded to speak with a supervisor.  She also threatened to sue the officers in federal court after receiving Cratsenburg's arrest warning.  Daniel contributed sporadically, making the same points as his wife.

Meanwhile, Buffa continued to speak with the home's occupants.  The 2714 Peachcrest residents initially agreed to let one officer inside.  But both Cratsenburg and Buffa rejected that

option as unsafe given the potential shooter's presence.  The residents eventually denied entry to a larger group of officers without a warrant.  So the officers surrounding the house decided to temporarily "lock it down" until they could obtain one.  Cratsenburg Bodycam Tr., R.69-2, PageID 1698.

Cratsenburg then enlisted Pearson to help arrest the Gradys, saying "[l]et's go deal with them" and "[s]he's going."  *Id.*  The two officers walked down the driveway, around the police car parked across the street, and approached the Gradys on the eastern side of the 2714 Peachcrest property.  As the officers took that path, they passed several individuals standing in the front yard and driveway of the home directly across from 2714 Peachcrest.  Those neighbors were also filming.  But they did so from well behind the police car and the two officers that formed the northern portion of the 2714 Peachcrest perimeter.

Cratsenburg informed the Gradys that they were under arrest for interfering with the officers' investigation.  Things escalated as both Gradys physically struggled against arrest. Shatina bit Pearson's arm; he responded with closed-fist strikes to dislodge the bite.  Daniel struggled with multiple officers while attempting to reach his wife; Cratsenburg warned Daniel that he would deploy his taser and eventually did so.  When Daniel asked why he was under arrest, Cratsenburg explained that the Gradys were interfering with an investigation and were "f***ing right up on" the officers, who were "trying to work a shooting scene."  *Id.* at PageID 1700.  All in all, officers took about a minute to subdue the Gradys and place both into handcuffs.

The arrests sparked a significant reaction from bystanders.  Once the altercation between Pearson and Shatina began, neighbors started gathering nearby and shouting.  Much of the yelling is indistinct on the officers' bodycam footage, but the statements that are audible are highly critical of the officers.  The officers testified that none of those individuals—or any other bystanders that night—were arrested.

While walking the Gradys to separate police cars, officers spotted an individual matching the shooter's description.  Pearson and another officer gave chase but eventually lost the suspect in a neighboring yard.  Meanwhile, Cratsenburg and another officer attempted to place Shatina

into a nearby cruiser. As Shatina resisted, bystanders moved in front of the car, filming and shouting various criticisms at the officers. During the struggle, Shatina accused Cratsenburg of arresting her for reminding the officers of their "oath of office." *Id.* at PageID 1710. Cratsenburg disagreed, reiterating that the arrest was "[b]ecause [the Gradys] were standing right in front of a house where a shooting took place" and he "was telling [them] to back up." *Id.* at PageID 1710-11. Shatina was then deposited into the cruiser, where she began kicking the interior and cursing the officers.

Both Gradys were transported to Washtenaw County Jail. Meanwhile, the officers finished securing the scene on Peachcrest Street. One group swept the target home while a canine unit pursued the suspect whom Pearson spotted. Neither group apprehended the shooter. But officers did discover a spent casing and a live round in the driveway.

B

The events of that evening spawned two parallel proceedings. First, the Gradys were criminally prosecuted for assaulting, resisting, or obstructing the officers under Michigan Compiled Laws § 750.81d(1). Shatina also faced charges for damaging the police cruiser. After a two-day trial in January 2024, a jury acquitted the Gradys on all counts.

Second, the Gradys filed this suit while their criminal charges were pending. They pressed several state- and federal-law claims including, as relevant here, First Amendment retaliation against arresting officers Cratsenburg and Pearson. Discovery proceeded and the officers eventually moved for summary judgment across the board.

In March 2025, the district court granted summary judgment to the officers on all but the First Amendment retaliation claim. Because many of the Gradys' claims—like unlawful arrest—turned on whether officers had probable cause to arrest the Gradys, the district court started there. The district court focused its probable-cause analysis on the Michigan criminal statute under which the Gradys were prosecuted, Michigan Compiled Laws § 750.81d(1). That statute directs that any individual who knowingly "assaults, batters, wounds, resists, obstructs, opposes, or endangers" officials in the course of their duties commits a felony. *Id.* Criminal

obstruction can be accomplished by either "physical interference" or "a knowing failure to comply with a lawful command." *Id.* § 750.81d(7)(a).

The district court held that the officers had probable cause to arrest the Gradys under the failure-to-comply theory of obstruction. The Gradys had conceded that they never followed the officers' orders. Whether that conduct was criminal under § 750.81d(1) thus came down to whether the officers' orders were "lawful." *Id.* § 750.81d(7)(a). In addressing that question, the district court affirmed the officers' authority "to enforce a reasonable perimeter around the house" while they attempted to apprehend a shooter. Dist. Ct. Op., R.80, PageID 4256. It then held that there was no "material dispute that police created a rudimentary perimeter around the house." *Id.* at PageID 4266. As for the back-up orders themselves, it concluded that reasonable officers would view the orders as lawful "conduct-based order[s]" with an "incidental" effect on speech. *Id.* Together, that all summed to probable cause: Any police officer could reasonably "conclude that the Gradys had likely disobeyed a lawful order by entering the edge of their perimeter and refusing an order to back up outside of it." *Id.* at PageID 4267.

The district court's probable cause determination foreclosed the bulk of the Gradys' claims. But under the Supreme Court's decision in *Nieves*, a narrow window remained to pursue First Amendment retaliation. Even accepting that officers had probable cause, the Gradys' retaliation claim could proceed if they identified "objective evidence that [they were] arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407. That is, the Gradys would need to satisfy the *Nieves* exception.

The district court evaluated the Gradys' First Amendment retaliation claim based on two types of protected conduct: filming and criticizing the officers. It then held that the Gradys satisfied the *Nieves* exception because certain similarly situated neighbors across the street from 2714 Peachcrest had not criticized officers and were never arrested. The district court further rejected the officers' entitlement to qualified immunity. It reasoned that, under *Nieves*, it is "clearly established . . . that a retaliatory arrest made for the purpose of punishing speech violates the First Amendment," even when supported by probable cause, "if police normally do not

exercise their discretion to arrest for that conduct." Dist. Ct. Op., R.80, PageID 4285. The officers timely appealed.

## II

Under the collateral-order doctrine, the district court's denial of qualified immunity is a final order for purposes of 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 528-30 (1985). But our appellate jurisdiction is limited at this stage. We may only review a denial of qualified immunity "to the extent that it turns on an issue of law." *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016) (quoting *Mitchell*, 472 U.S at 530). We cannot revisit the district court's factual findings, save on rare occasions where those findings are so "blatantly contradicted by the record" that no reasonable jury could accept them. *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

The officers' present appeal turns on whether the Gradys can satisfy the *Nieves* exception. We have jurisdiction to decide that pure question of law. *See Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (per curiam); *DiLuzio*, 796 F.3d at 609-10. Because this case arises from summary judgment proceedings, we construe the facts and draw all inferences in the light most favorable to the Gradys. *Frenchko v. Monroe*, 160 F.4th 784, 795 (6th Cir. 2025).

## III

Officers are not liable under 42 U.S.C. § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). We conclude that the Gradys' retaliatory arrest claim against Cratsenburg and Pearson fails to demonstrate any First Amendment violation. So our qualified immunity analysis begins and ends there. *See Frenchko*, 160 F.4th at 795.

## A

Because the Gradys' claim turns on recent developments in the Supreme Court's retaliatory arrest caselaw, we begin with a recap of current doctrine.

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" based on the exercise of protected speech rights. *Nieves*, 587 U.S. at 398 (brackets omitted) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). Those asserting First Amendment retaliation face a burden-shifting framework that often reduces to a dispute over causation. A plaintiff must show that "the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (per curiam). To defeat that linkage, defendants may seek to demonstrate a non-retaliatory basis for the action at issue. *See, e.g.*, *Nieves*, 587 U.S. at 404; *Frenchko*, 160 F.4th at 803 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

When the alleged retaliatory act is an arrest, though, causation can get thornier. That's because protected speech "is often a 'wholly legitimate consideration' for officers when deciding whether to make an arrest." *Nieves*, 587 U.S. at 401 (quoting *Reichle*, 566 U.S. at 668). Speech can, for instance, "provide[] evidence of a crime or suggest[] a potential threat." *Reichle*, 566 U.S. at 668. That speech-arrest interplay can make it "particularly difficult" to discern whether an officer's consideration of speech reflected unlawful animus, on one hand, or permissible assessment of suspected criminal conduct, on the other. *Nieves*, 587 U.S. at 402. Compounding the difficulty, improper motive is "easy to allege and hard to disprove." *Id.* at 403 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 585 (1998)). So a subjective-allegation-only standard would have risked chilling officers' exercise of important duties by permitting "even doubtful retaliatory arrest suits to proceed." *Id.*

The Supreme Court's retaliatory arrest framework seeks to account for those challenges. It does so by creating a default rule, applicable in all cases, that links causation with the presence or absence of objective probable cause to arrest. *Id.* at 404. The result is straightforward: The presence of probable cause to arrest generally defeats a First Amendment retaliatory arrest claim. *Id.* at 405. Plaintiffs therefore must "plead and prove the absence of probable cause for the arrest" to proceed with suit. *Id.* at 402. Giving probable cause a gatekeeping role reflects the Supreme Court's calculation that a lack of probable cause will often "provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest

the opposite." *Id.*; *see also Hartman*, 547 U.S. at 261 (explaining the "powerful evidentiary significance" of probable cause in the typical retaliatory prosecution case).

But under *Nieves*, an exception travels alongside the no-probable-cause rule: Even when probable cause is present, a plaintiff's retaliatory arrest claim can advance to the traditional burden-shifting framework if he provides "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." 587 U.S. at 407.[1] The *Nieves* exception targets situations "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 406. Given the prevalence of "minor criminal offense[s]," that outlet helps guard against the "risk that some police officers may exploit the arrest power as a means of suppressing speech." *Id.* at 406-07 (first quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); then quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 99 (2018)).

Causation logic helps explain the exception's justification and scope. Consider *Nieves*'s example of "jaywalking"—an offense that is prevalent yet "rarely results in arrest," even with probable cause. *Id.* at 407. If an officer breaks trend and arrests the only jaywalker who was also engaging in protected speech, the presence of probable cause "does little to prove or disprove the causal connection between animus and injury." *Id.* Instead, the general rarity of jaywalking arrests—and the targeting of the speaker among many other lawbreakers—may suggest that the officer's arrest stemmed from the speech, not the jaywalking. *Id.* In that way, the similarly situated exception serves as a kind of control experiment; it helps isolate the role of an arrestee's speech by holding constant other variables, like the presence of probable cause, that might alternatively explain an arrest. Satisfying the exception in turn "opens the door to the traditional First Amendment retaliation framework," where plaintiffs can attempt to show that speech was indeed a motivating factor. *Frenchko*, 160 F.4th at 803.

Despite its importance, "the *Nieves* exception is slim." *Gonzalez*, 602 U.S. at 658. And only "objective evidence" can satisfy it. *Nieves*, 587 U.S. at 407. As *Nieves* noted, such

---

[1]There is another exception for cases that involve official policies of retaliation. *See Lozman v. Riviera Beach*, 585 U.S. 87, 100-01 (2018); *see also Brown v. City of Albion*, 136 F.4th 331, 338-40 (6th Cir. 2025) (discussing the *Lozman* exception). That exception does not apply here.

evidence might be officers' failure to arrest others who were similarly situated to the plaintiff. *Id.* But evidence outside of "virtually identical and identifiable comparators" can also suffice. *Gonzalez*, 602 U.S. at 658. Thus, in *Gonzalez v. Trevino*, Gonzalez satisfied the *Nieves* exception with a survey demonstrating that "no one ha[d] ever been arrested for engaging" in the conduct at issue—there, "trying to steal a nonbinding or expressive document" following a public meeting. *Id.* at 657-58 (citation modified). That non-enforcement history tended to prove that officers had "typically exercise[d] their discretion not to" arrest persons in like circumstances. *Id.* at 658 (quoting *Nieves*, 587 U.S. at 406). As with the jaywalker above, Gonzalez's abnormal treatment thus went to causation. *Id.* It gave reason to question that her arrest indeed stemmed from her allegedly criminal conduct, rather than from a "sham charge" ginned up as unlawful retaliation for her speech. *Id.* at 657 (citation omitted). And that objective evidence allowed Gonzalez's claim to proceed. *Id.* at 658.

## B

The Supreme Court's retaliatory arrest rules left the Gradys two ways to advance their claim. They could either prove that officers in fact lacked probable cause to arrest them. Or they could attempt to put forward "objective evidence" to satisfy the *Nieves* exception. 587 U.S. at 407. As discussed next, neither path works.

## 1

We need not pause long on the no-probable-cause avenue. In a thorough assessment under Michigan law, the district court concluded that officers Cratsenburg and Pearson indeed had probable cause to arrest the Gradys. Because the Gradys have not challenged that conclusion, it controls here. *See Reichle*, 566 U.S. at 662-63 & n.3; *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008).

Again, the relevant statute establishes a felony offense covering any "individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers" officers in the course of their duties. Mich. Comp. Laws § 750.81d(1). As the district court set out, one method of obstruction is failing to comply with a lawful order from the police. Dist. Ct. Op., R.80, PageID 4226 (citing Mich. Comp. Laws § 750.81d(7)(a)); *see also People v. Corr*, 788 N.W.2d 860, 863 (Mich. Ct.

App. 2010) (per curiam). Applying that statute, the district court first affirmed the officers' power to establish and enforce a perimeter around 2714 Peachcrest as part of their shooting investigation. It further determined that any reasonable officer would have viewed issuing the get-back orders as a lawful exercise of that authority. So when the Gradys knowingly defied officers' directives by "entering the edge of their perimeter and refusing an order to back up outside of it," their actions gave the officers probable cause to arrest the couple for violating § 750.81d(1). Dist. Ct. Op., R.80, PageID 4267.

On appeal, the officers' *Nieves*-based argument began by defending the district court's probable-cause determination. Yet the Gradys do not contest the district court's conclusion that probable cause was present. Their five-page response brief touts the correctness of the district court's analysis and frames the issue around application of "the exception to probable cause found in *Nieves*." Grady Br. v. And at oral argument, the Gradys' counsel agreed that the district court's probable-cause determination was sound. We therefore accept the district court's conclusion that Cratsenburg and Pearson had probable cause to arrest the Gradys under § 750.81d(1) for obstructing officers in the course of their duties.

2

The presence of probable cause tees up application of the *Nieves* exception. Under it, the Gradys must demonstrate that they were "arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407. "To fall within the exception, a plaintiff must produce evidence to prove that his arrest occurred in such circumstances." *Gonzalez*, 602 U.S. at 658. And the evidence "must be objective." *Id.*

The Gradys sought to carry their *Nieves* burden with a single kind of evidence: the presence of similarly situated individuals at the scene who were not arrested. The cited comparators—on which the district court also exclusively relied—were neighbors who stood across the street from 2714 Peachcrest.[2]

---

[2]At oral argument, counsel for the Gradys suggested that other individuals who approached the police during and after the Gradys' arrest may be comparators too. That late-game suggestion at oral argument to add a yet-unraised group of comparators fails against our forfeiture rules. *Resurrection Sch. v. Hertel*, 35 F.4th 524, 530 (6th Cir. 2022) (en banc).

Applying the *Nieves* exception, we disagree that these proffered comparators permit the Gradys' retaliation claim to proceed.

*Filming theory.* The Gradys' theory that they were retaliated against for filming the officers flunks the *Nieves* exception's plain terms. To satisfy *Nieves* with comparator evidence, the Gradys needed to show that officers failed to arrest individuals "not engaged in the same sort of protected speech" as the Gradys themselves. 587 U.S. at 407. But all agree that the cited neighbors across the street were also filming officers. So the Gradys lack any evidentiary basis for filming-based animus under the *Nieves* exception.

*Critical-speech theory.* That leaves a critical-speech theory of retaliation, fleshed out for the first time by the district court in its opinion. According to the district court, evidence showed that the Gradys shouted vocal critiques of officers and were subsequently arrested, while the across-the-street neighbors stayed silent and were not arrested. That dynamic, in the district court's view, demonstrated that the Gradys were arrested when "otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." Dist. Ct. Op., R.80, PageID 4276 (quoting *Nieves*, 587 U.S. at 407).

In deeming the neighbors and the Gradys similarly situated, the district court dismissed several differences between the two groups. Recall the conduct leading to the Gradys' arrest: police established a "rudimentary perimeter around the house" and surrounded it with guns drawn; the Gradys walked within the perimeter to a point closer to the target house than any other bystander; and the Gradys ignored over a dozen lawful commands to step back. *Id.* at PageID 4266-67. Together, that conduct gave officers Cratsenburg and Person probable cause to arrest the Gradys under Michigan Compiled Laws § 750.81d(1) for disobeying the officers' lawfully issued orders.

By contrast, the Gradys' proposed comparators stood outside the officers' perimeter and never received a single order. And the district court did not conclude that they committed any potentially criminal conduct, whether under § 750.81d(1) or any other statute. The district court nonetheless deemed the neighbors close enough to count as comparators because: (1) They stood near the police officers stationed across the street from 2714 Peachcrest (and were perhaps closer

to individual officers than were the Gradys), (2) they "filmed the encounter from a distance," and (3) like the Gradys, they "were not within the property itself." Dist. Ct. Op., R.80, PageID 4278-79.

That similarly situated analysis does not withstand scrutiny. The core problem is that the district court sidestepped the need to assess whether the neighbors were committing the same conduct that led to the Gradys' arrest. The result was a false equation of the Gradys, who engaged in conduct that created probable cause, with other neighbors, who did not. Such an apples-to-oranges comparison stretches the *Nieves* exception beyond recognition.

Consider again the *Nieves* exception's role. It addresses "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U.S. at 406. Needed is "objective evidence" that the challenged arrest was outside the norm—and thus more likely to stem from speech-based animus than from probable cause. *Id.* at 407. The rationale of the *Nieves* exception thus reflects that certain objective evidence can help address the "causal concern" with arrest-based retaliation claims by helping isolate the role of protected speech in officers' arresting decisions. *Id.*

But examining officers' exercise of discretion in the way *Nieves* instructs requires assessing whether others were committing the same kind of conduct that led to the claimant's arrest. *See Gonzalez*, 602 U.S. at 658. Otherwise, the exception's comparator-based logic breaks down: When police arrest a speaker who they reasonably believe *committed a crime*, their failure to also arrest individuals who *acted lawfully* proves nothing. That follows no matter whether the law-abiders might share some other superficial similarities (like standing near a police officer) with the arrestee.

Our post-*Nieves* caselaw highlights courts' need to home in on the arrest-generating conduct. In *Brown v. City of Albion*, 136 F.4th 331, 343-44 (6th Cir. 2025), officers had probable cause to arrest the plaintiff for violating a local regulation. Applying *Nieves*, we explained that the plaintiff could proceed only with evidence "that comparable crimes were not prosecuted" or that "officers typically do not arrest someone for the conduct [she] engaged in." *Id.* at 340. And we framed that comparative inquiry narrowly: Critical was whether the

plaintiff's evidence demonstrated that her "*particular* type of behavior" had been overlooked in others or "suggest[ed] that others ha[d] violated *this same provision* and not been charged." *Id.* at 341-42 (emphases added). The plaintiff lacked that evidence, so she could not satisfy the *Nieves* exception. *Id.*

The same went for the plaintiffs in *Hartman v. Thompson*, 931 F.3d 471, 484 (6th Cir. 2019), who sued after being arrested for disorderly conduct. The *Nieves* exception was unavailable, we held, because the plaintiffs failed to offer "objective evidence that similarly situated individuals at the [same event] had been allowed to engage in *similarly disruptive activities* without arrest." *Id.* at 484 n.6 (emphasis added). It was not enough, then, for the plaintiffs to point to others located at the event; they needed comparators whose conduct mirrored that providing probable cause for the plaintiffs' arrest. Other circuits, too, approach the similarly situated inquiry by looking for whether an arrestee "was treated differently than others who engaged *in the same conduct*." *Stanley v. Bocock*, 160 F.4th 573, 578 (4th Cir. 2025) (emphasis added).[3]

Whatever their other commonalities with the Gradys, the neighbors across the street were not engaged in the same "type of behavior" that led to the Gradys' arrest. *Brown*, 136 F.4th at 341. To reiterate, two actions gave officers probable cause to arrest the Gradys: their approaching the police perimeter and defying police orders to retreat. The neighbors' conduct did not come close to implicating either justification. Without comparable proximity to the perimeter, the officers had no reason to order the across-the-street neighbors to back up. Without comparable defiance, the officers had no basis to arrest them. *See* Mich. Comp. Laws § 750.81d(1).

---

[3]*See also, e.g.*, *Buehler v. Dear*, 27 F.4th 969, 993-94 & n.102 (5th Cir. 2022) (man arrested for interfering with officers' official duties lacked comparators because no one else "continued to stand within arms' length of the Officers for a prolonged period after being ordered to stand back, as [the plaintiff] did"); *Lund v. City of Rockford*, 956 F.3d 938, 947 (7th Cir. 2020) (journalist arrested for driving the wrong way down a one-way street lacked comparators because he failed to show that others "have not been and would not be arrested for driving the wrong way down a one-way street"); *Frey v. Town of Jackson*, 41 F.4th 1223, 1230, 1234 (10th Cir. 2022) (man arrested for declining a pat-down lacked comparators when he failed to provide evidence that officers "declined to arrest other individuals . . . who refused to submit to pat downs mandated by airport procedure").

The upshot: The proffered comparators never engaged in conduct that might have supported their arrest. So the neighbors' non-arrest says nothing about whether officers selectively targeted the Gradys, among other lawbreakers, for "comparable behavior." *Gonzalez*, 602 U.S. at 668 (Alito, J., concurring); *see Brown*, 136 F.4th at 341-42; *Nieves*, 587 U.S. at 407. That means the neighbors are not "otherwise similarly situated" for *Nieves* purposes. *Nieves*, 587 U.S. at 407.

Our conclusion does not skirt *Gonzalez* by requiring evidence of "virtually identical . . . comparators." 602 U.S. at 658; *cf.* Dist. Ct. Op., R.80, PageID 4278. Other pathways of objective proof, like the non-enforcement data in *Gonzalez*, remain open; it is just that the Gradys declined to advance anything beyond comparator evidence here. Nor does this case require us to exhaustively define what it means for a comparator to be similarly situated— by addressing, for instance, whether a comparator's conduct must violate the same criminal statute, be of the same severity, or present similar safety risks to officers or the public. Instead, we hold only that, to be similarly situated for *Nieves* purposes, non-arrested persons must at least have engaged in similar conduct to that which led to the claimant's arrest. For reasons given above, the Gradys' comparators fail that baseline requirement.

\*     \*     \*

Without the *Nieves* exception, the no-probable-cause rule applies and bars the Gradys' retaliatory arrest claim as a matter of law. We therefore reverse the district court's denial of summary judgment to officers Cratsenburg and Pearson on the First Amendment retaliation claim and remand for proceedings consistent with this opinion.