# SUPREME COURT OF THE UNITED STATES

PRISCILLA VILLARREAL *v.* ISIDRO R. ALANIZ, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 25–29.   Decided March 23, 2026

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, dissenting from the denial of certiorari.

Petitioner Priscilla Villarreal is a reporter who was arrested for doing something journalists do every day: posing questions to a public official. Specifically, Villarreal twice texted with a police officer to corroborate information Villarreal already knew about events that had occurred within her community. That officer voluntarily provided the information Villarreal sought, and Villarreal published those facts, consistent with her role as a journalist. Six months later, Villarreal was arrested for asking those questions. Making matters worse, Villarreal alleges that the arrest followed a months-long effort by a police department and district attorney's office to retaliate against her because they disliked much of her reporting on their activities. Of course, that reporting was often critical of them.

It should be obvious that this arrest violated the First Amendment. Yet the Fifth Circuit held that the officials were entitled to qualified immunity, and now Villarreal is left without a remedy. The Court today makes a grave error by declining to hear this case.

## I

Because this case comes to the Court on a motion to dismiss, the facts as stated in Villarreal's complaint, recounted here, and relied on in the analysis below, are assumed to be true. *Hui* v. *Castaneda*, 559 U. S. 799, 802, n. 1 (2010). Documents incorporated by reference in the complaint also

inform the sufficiency of Villarreal's claims. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U. S. 308, 322–323 (2007).

Villarreal is a citizen journalist. (She reports under the name "Lagordiloca." App. to Pet. for Cert. 224a (App.)) Well over a 100,000 people follow her Facebook page, where she covers newsworthy events in her community. Her regular subjects include the Laredo Police Department and local government officials in Webb County. At times she praises the conduct of those officials. Other times she is critical of them, or posts content that she says is "unfavorable" to them. *Id.*, at 229a.

Villarreal often live streams interactions between officers and community members. On one occasion, she recorded officers choking an individual during a traffic stop. On another occasion, she reported on a homeowner who was accused of animal cruelty after many severely malnourished animals were found on the person's property. Villarreal criticized the district attorney for declining to prosecute and instead pursuing a civil settlement with the homeowner, who was also the assistant district attorney's close relative. The district attorney later held a closed-door meeting with Villarreal where she says he told her that he "did not appreciate her criticizing his office." *Id.*, at 231a.

As this interaction reveals, local officials are aware of Villarreal's reporting. Villarreal contends that they do not like it and that they have made their displeasure known. For example, Villarreal recounts how one officer attempted to discredit her in front of other officers by declaring, falsely, that Villarreal is a five-time convicted felon. Villarreal says that another attempted to obstruct her reporting at a crime scene by threatening to take her phone, which she uses to live stream to her followers, claiming that the phone was "'evidence.'" *Id.*, at 230a. Eventually, officials began "plotting [her] takedown." *Villarreal* v. *Laredo*, 94 F. 4th 374, 407 (CA5 2024) (Willett, J., dissenting).

That brings us to the dispute underlying this action. On two occasions in the spring of 2017, Villarreal texted a source within the police department, with whom she had communicated many times before, for details about events that had occurred in her community. The first request included the name and identification of a border agent who died by suicide. The second included the name and condition of a person involved in a fatal traffic accident. Villarreal had already learned these facts from private sources, and the officer she texted willingly gave her the information she requested. With that corroboration in hand, Villarreal then published those details on her Facebook page.

Six months later, police officers secured two warrants for Villarreal's arrest, one for each incident. As Villarreal describes it, the warrants were the result of a months-long investigation in which police officers worked closely with the local district attorneys' office to come up with charges against her. Those officials eventually accused Villarreal of violating Texas Penal Code Ann. §39.06(c) (West Cum. Supp. 2025), which states that "[a] person commits an offense if, with intent to obtain a benefit . . . , he solicits or receives from a public servant information that: (1) the public servant has access to by means of his office or employment; and (2) has not been made public."[1] In the 23 years since the statute was enacted, there is no documented arrest in Webb County, let alone conviction, for violating §39.06(c). 94 F. 4th, at 404–406 (Higginson, J., dissenting). Villarreal says that she was the first.

In affidavits submitted with the warrant application to the Magistrate Judge, an officer attested that Villarreal

_____

[1] "Benefit" is defined as "anything reasonably regarded as economic gain or advantage." Tex. Penal Code Ann. §1.07(a)(7) (West Cum. Supp. 2025). "[I]nformation that has not been made public" is defined as "any information to which the public does not generally have access, and that is prohibited from disclosure under [the Texas Public Information Act]." §39.06(d).

sought to "benefit" from the information she received from the officer by using it to increase her popularity on Facebook. App. 241a–242a. The affidavits did not address how the information Villarreal asked for, received, and later reported about these two incidents fell within the definition of nonpublic information under Texas law. Villarreal, moreover, has alleged that the officer deliberately misled the Magistrate Judge because he knew that Villarreal "sought *no* benefit from her sourcing, and that she had obtained *no* non-public information." 94 F. 4th, at 402 (Higginson, J. dissenting).

After learning of the arrest warrants, Villarreal turned herself in. At the station, Villarreal alleges that police officers "surrounded her, laughed at her, took pictures with their cell phones, and 'otherwise show[ed] their animus toward Villarreal with an intent to humiliate and embarrass her.'" *Id.*, at 384 (majority opinion). Villarreal was detained at the local jail before she was released on bond. She later filed a writ of habeas corpus, which a Texas state-court judge granted in an oral ruling from the bench after declaring the statute unconstitutionally vague. The county did not appeal.

Villarreal sought redress. She filed this action under 42 U. S. C. §1983 in Federal District Court against the officials involved in her arrest. She alleged that they had violated her First Amendment rights (among others) both (1) directly by arresting her for asking questions of a public official and (2) in retaliation for her earlier reporting. The District Court dismissed the lawsuit in its entirety, concluding that, even accepting the truth of Villarreal's allegations, the officials were entitled to qualified immunity. The Fifth Circuit initially reversed, holding that Villarreal's "arrest was 'obviously' unconstitutional," 94 F. 4th, at 384, but the full en banc court, by a deeply divided vote, vacated the panel decision and affirmed the District Court.

Villarreal then filed a petition for certiorari to this Court. The Court granted the petition, vacated the Fifth Circuit's en banc decision, and ordered further consideration in light of *Gonzalez* v. *Trevino*, 602 U. S. 653 (2024) (*per curiam*), which clarified the evidentiary burden for proving a retaliatory arrest under the First Amendment. *Villarreal* v. *Laredo*, 604 U. S. 973 (2024). On remand, a divided Fifth Circuit, still sitting en banc, construed this Court's order to mean that the "sole claim" it "ought to reconsider" was Villarreal's First Amendment retaliation claim, and that its "previous en banc majority opinion [wa]s superseded only to [that] extent." *Villarreal* v. *Laredo*, 134 F. 4th 273, 275, 276 (2025). It then summarily concluded that the officials were entitled to qualified immunity. This petition followed.

## II

To defeat a claim of qualified immunity, an individual must show that an official violated her constitutional rights, and that the official had "fair warning that their conduct violated the Constitution." *Hope* v. *Pelzer*, 536 U. S. 730, 741 (2002). Although "there does not have to be 'a case directly on point'" for this fair-notice requirement to be satisfied, "existing precedent must place the lawfulness of the particular [conduct] 'beyond debate.'" *District of Columbia* v. *Wesby*, 583 U. S. 48, 64 (2018).

Importantly, "'general statements of the law are not inherently incapable of giving fair and clear warning.'" *Hope*, 536 U. S., at 741. This means that "officials can still be on notice that their conduct violates established law even in novel factual circumstances" when "'a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question.'" *Ibid.*; see also *Taylor* v. *Riojas*, 592 U. S. 7, 8–9 (2020) (*per curiam*). In other words, there can be an "'obvious case,' where the unlawfulness of the officer's conduct is

sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U. S., at 64.

## III

The adverse action taken against Villarreal is an example of an "'obvious case.'" *Ibid*. Even absent a factually similar precedent, the contours of Villarreal's First Amendment rights were sufficiently clear to place the unlawfulness of the officials' alleged conduct "'beyond debate.'" *Ibid*.

## A

The First Amendment protects the "right of citizens to inquire, to hear, to speak, and to use information." *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 339 (2010). It also protects a free press, "bar[ring] [the] government from interfering in any way with" its function. *Pell* v. *Procunier*, 417 U. S. 817, 834 (1974). This encompasses safeguarding "routine newspaper reporting techniques." *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97, 103 (1979). Indeed, "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg* v. *Hayes*, 408 U. S. 665, 681 (1972).

This case implicates one of the most basic journalistic practices of them all: asking sources within the government for information. Each day, countless journalists follow this practice, seeking comment, confirmation, or even "scoops" from governmental sources. Reasonably so. "A free press cannot be made to rely solely upon the sufferance of government to supply it with information." *Daily Mail*, 443 U. S., at 104.[2]

_____

[2] That is not to say that the government cannot impose limits on newsgathering. As the Court has explained, journalists have a right to "seek news from any source by means within the law." *Branzburg* v. *Hayes*, 408 U. S. 665, 681–682 (1972). The First Amendment, however, necessarily places limits on how far States can go in deeming certain practices unlawful. This case presents no occasion to consider where that line may

Guided by these principles, journalists are "free to seek out sources of information not available to members of the general public." *Pell*, 417 U. S., at 834. Although the press is not entitled to special access to government information or facilities, the government also generally "cannot prevent [the press] from learning about [government functions]" in a variety of ways, including by "seek[ing] out . . . public officials." *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 15 (1978) (plurality opinion). In other words, the government has no obligation to make nonpublic information available to journalists, and if an official declines to provide information, the journalist usually has no recourse. See *Pell*, 417 U. S., at 834.

If, however, an official voluntarily chooses to convey information, three things are clear. First, only in the rarest of circumstances can the government prevent or punish the information's publication. See *Daily Mail*, 443 U. S., at 103 (requiring "'a need to further a state interest of the highest order'" before punishing); *New York Times Co.* v. *United States*, 403 U. S. 713, 714 (1971) (*per curiam*) (requiring the "'heavy burden of showing justification for the imposition of such a restraint'" on publication). Second, the government is free to discipline the official, the very person it hired, trained, and supervised in the handling of confidential information. *Florida Star* v. *B. J. F.*, 491 U. S. 524, 534–535 (1989). Third, the government certainly cannot punish the journalist simply for making the request.

Villarreal followed this core journalistic practice here. She asked a source within the local police department about

_____

fall, given that under any conception, asking a public official for nonpublic information as part of the journalist's verification efforts (with no allegations of force, coercion, deception, or bribery, see *Villarreal* v. *Laredo*, 94 F. 4th 374, 408, n. 9 (CA5 2024) (Willett, J., dissenting), or suggestions that the journalist knew the information was protected from disclosure, see App. 242a) would fall outside of what could be criminalized consistent with the Constitution.

two incidents that occurred within her community. The source could have refused to answer Villarreal's questions. Instead, the source voluntarily gave Villarreal the information she sought, and Villarreal later published it. What happened next flies in the face of the core guarantee of the First Amendment: By arresting Villarreal, rather than solely disciplining the employee for any wrongdoing, county officials took this "everyday journalism" and transformed it "into a crime." Pet. for Cert. 2.

This was a blatant First Amendment violation. No reasonable officer would have thought that he could have arrested Villarreal, consistent with the Constitution, for asking the questions she asked. Such an arrest is plainly inconsistent with basic First Amendment principles. See *supra*, at 6–7. It is also inconsistent with how officers (including the officers in this very county) are trained to interact, and have historically interacted, with the press. See Brief for Reporters as *Amici Curiae* on Pet. for Cert. 7–14. Finally, although there is not a direct, factually analogous precedent confronting this situation, that is unsurprising and, more importantly, irrelevant given just how "'obvi-ous[ly]'" unconstitutional the officials' conduct here was. *Wesby*, 583 U. S., at 64; *Browder* v. *Albuquerque*, 787 F. 3d 1076, 1082–1083 (CA10 2015) (Gorsuch, J.) ("[I]t would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt").

B

Despite all of this, the Fifth Circuit held that the arrest was lawful. Primarily, the court reasoned that because Villarreal alleged that the officials violated her First Amendment rights by arresting her, she had to prove a Fourth Amendment violation too, which, in its view, she failed to

do. 94 F. 4th, at 384–385.[3] Even assuming such an inquiry is relevant, the Fifth Circuit's analysis does not withstand scrutiny.

First, the Fifth Circuit found that the officials reasonably believed that they had probable cause to arrest Villarreal for violating §39.06(c). *Id.*, at 385–390. Not so. Just like an individual cannot be convicted of a crime for engaging in First Amendment activity, see *Bachellar* v. *Maryland*, 397 U. S. 564, 570–571 (1970), it is axiomatic that a probable-cause determination cannot be based on such protected activity either. As the Court explained in *Wayte* v. *United States*, 470 U. S. 598 (1985), "the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." *Id.*, at 608 (internal quotation marks and citations omitted). It necessarily follows that when an arrest is based on protected First Amendment activity, that activity cannot constitute probable cause and support adverse police action. All reasonable officers know this.

Second, the Fifth Circuit found that even if probable cause was lacking, the officials' actions were still reasonable under the Fourth Amendment. That is because the officials had acted pursuant to a state statute, and, according to the court, given that no "final decision of a state court" had found that statute unconstitutional before Villarreal's arrest, the officials could have reasonably relied on the statute here. 94 F. 4th, at 390–393. In other words, in the

---

[3] The Fifth Circuit at times appeared to disparage Villarreal, describing her reporting as "capitaliz[ing] on others' tragedies to propel her reputation and career" and admonishing attempts to "portray her as a martyr for the sake of journalism." 94 F. 4th, at 381–382. The First Amendment does not protect only those journalists whose work is deemed valuable by judges; rather, it "'shields [all] who wan[t] to speak or publish when others wish [them] to be quiet.'" *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 539, 559 (1985).

court's view, the officials committed a reasonable mistake of law by presuming that §39.06(c) was constitutional and enforcing it against Villarreal.

The presence of the state statute, however, does not and cannot insulate the officials from liability. Just like it is unreasonable to rely on a statute that is "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws," *Michigan* v. *DeFillippo*, 443 U. S. 31, 38 (1979), it is also unreasonable to "enforc[e] a statute in an obviously unconstitutional way," 94 F. 4th, at 407 (Willett, J., dissenting). Here, it is hard to conceive of a more obvious constitutional violation than arresting a journalist who, in searching for corroboration, simply asks a government source for information. That is the essence of many journalists' jobs. The arrest does not somehow become reasonable, and constitutional, merely because an unconstitutional application of a statute authorizes it. See 42 U. S. C. §1983 (a state official "shall be liable" for constitutional violations if he acted "under color of any [state] statute").

Finally, the Fifth Circuit held that the officials were shielded from liability because the Magistrate Judge had issued the warrants for Villarreal's arrest. 94 F. 4th, at 393–394. The independent-intermediary doctrine does not save the officials here. "[T]he fact that a neutral magistrate [judge] has issued a warrant authorizing the allegedly unconstitutional" arrest "does not end the inquiry into objective reasonableness." *Messerschmidt* v. *Millender*, 565 U. S. 535, 547 (2012). Rather, an official can still be held liable "when 'it is obvious that *no* reasonably competent officer would have concluded that a warrant should issue.'" *Ibid.* This standard is satisfied in this case because the arrest was obviously unconstitutional for the reasons explained above. See *supra*, at 6–8. Even putting that aside, the officers here never told the Magistrate Judge how or why the information was protected from disclosure under

Texas law, see *supra*, at 3, and n. 1, and there are good reasons to believe that it was not, see 94 F. 4th, at 411–412, 417–418 (Ho, J., dissenting) (making this argument).

C

The Court should have granted the petition to resolve tension between the decision below and decisions from the Sixth, Eighth, and Tenth Circuits. Those three courts have each denied officials qualified immunity when those officials violated individuals' First Amendment rights by arresting them, even when those officials had argued that the arrestees' conduct technically fell within the bounds of a state law, that they had arguable probable cause for the arrest, and, in one case, that a Magistrate Judge had authorized the arrest. See *Leonard* v. *Robinson*, 477 F. 3d 347, 352, 356, 361 (CA6 2007) (denying qualified immunity to officer invoking four statutes to arrest man for saying "God damn" at township board meeting); *Snider* v. *Cape Girardeau*, 752 F. 3d 1149, 1154, 1157 (CA8 2014) (same for officer who invoked a statute and secured a warrant from a Magistrate Judge to arrest citizen for trying to burn and shred an American flag); *Jordan* v. *Jenkins*, 73 F. 4th 1162, 1167, 1171 (CA10 2023) (same for officer who used state obstruction of justice statute to arrest a police critic).

The Court's intervention is warranted because the Fifth Circuit's position undermines important bedrock constitutional protections. Under its view, police officers may arrest journalists for core First Amendment activity so long as they can point to a statute that the activity violated and that no high state court had previously invalidated, whether facially or as applied. This rule creates a perverse scheme in which officials can arrest someone for protected activity, decline to appeal a trial court's decision declaring the statute unconstitutional (as the county did here), and use qualified immunity to avoid liability by citing back to that statute. The Court's decision today prevents

adjudication of whether this statute is constitutional and the extent to which this journalist's activities are protected. The Court thus allows this pattern to repeat.

The Fifth Circuit's opinion illustrates the implications. The court criticized Villarreal for asking her questions to a "backchannel[ed]" source, as opposed to following official channels to receive her information. 94 F. 4th, at 388–390, 398 (majority opinion). This appears to suggest that had Villarreal directed her questions to a public relations official for the department, for example, she would have fallen outside the scope of §39.06(c). On the face of the statute alone, it is not clear why. The statute does not draw a distinction between the kinds of "public servant[s]" from which a person "solicits" nonpublic information. §39.06(c). As a result, it arguably could be leveraged to reach the mundane act of asking questions to officials at press conferences, or at crime scenes, when the reporter intends to "benefit" by publishing any answer, even if she does not receive one. Under the Fifth Circuit's rule, however, no individual arrested in any of these circumstances would have recourse. Because of the Court's inaction today, neither does Villarreal.

IV

Below, Villarreal also claimed that the arrest violated her First Amendment rights in yet another way. Given the alleged history between Villarreal and local officials, she said that she was arrested as retaliation for her prior reporting. "'[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves* v. *Bartlett*, 587 U. S. 391, 398 (2019). This is a core protection: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston* v. *Hill*, 482 U. S. 451, 462–463 (1987).

According to Villarreal, for months local officers and prosecutors banded together to target her because they did not like much of her reporting. She alleged that her arrest was the culmination of those efforts, bringing to life the oft-cited danger of a state actor "'picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.'" *Morrison* v. *Olson*, 487 U. S. 654, 728 (1988) (Scalia, J., dissenting) (quoting R. Jackson, The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys, Apr. 1, 1940). "'It is this realm[,] in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the . . . danger of abuse of prosecuting power lies.'" *Ibid.*

If the events as recounted by Villarreal had occurred today, this would have been a profoundly easy case. As this Court held in *Nieves* v. *Bartlett*, 587 U. S. 391, and later reiterated in *Gonzalez* v. *Trevino*, 602 U. S. 653, although a plaintiff asserting a retaliatory-arrest claim must normally "plead and prove the absence of probable cause for the arrest," probable cause does not defeat her claim if she produces "objective evidence that [she] was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U. S., at 402, 407. This exception accounts for situations "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.*, at 406.

The exception surely would be satisfied on the facts as Villarreal alleged them. Villarreal engaged in protected speech (her reporting) that she contends is generally unpopular with local officials. Journalists, including those whose reporting efforts are likely more popular with those officials, presumably ask about nonpublic information all the time. Yet, according to Villarreal, she was the first and only person in Webb County to be arrested for allegedly violating

§39.06(c) in the statute's then 23-year history by asking about nonpublic information. In these circumstances, probable cause, even assuming that it was present, should pose no bar to Villarreal's retaliation claim.

Villarreal's arrest occurred before *Nieves*, however, so the Fifth Circuit found the case easy in the other direction. It pointed to *Reichle* v. *Howards*, 566 U. S. 658 (2012), in which this Court observed that it "has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." *Id.*, at 664–665. According to the Fifth Circuit, because Villarreal's arrest was apparently supported by probable cause, the officials were entitled to qualified immunity for her retaliation claim.

That conclusion is wrong for two reasons. First, as explained, there was no legitimate probable cause barring Villarreal's retaliation claim. See *supra*, at 8–11. In the typical retaliation claim, including the one that *Reichle* confronted, an officer arrests an individual for unlawful conduct not protected by the First Amendment in retaliation for the individual previously exercising her First Amendment rights. *Id.*, at 660–662. Here, by contrast, the basis for Villarreal's arrest was also protected conduct.

Second, even if that distinction were not enough, Villarreal pleaded that any probable-cause determination was tainted because the officers misled the Magistrate Judge. See *supra*, at 3–4. Under longstanding Circuit precedent, that taint meant that the officials could not rely on arguable probable cause to defeat Villarreal's retaliation claim. See *Hand* v. *Gary*, 838 F. 2d 1420, 1427–1428 (CA5 1988). I agree with Judge Higginson's dissent below that, at the motion-to-dismiss stage, Villarreal was entitled to further fact-finding to prove the veracity of those allegations. 94 F. 4th, at 401–404. Because of the Court's decision not to grant review today, however, she will never have the opportunity.

SOTOMAYOR, J., dissenting

\*    \*    \*

The First Amendment prohibits "abridging the freedom . . . of the press." In our constitutional order, "the press serves and was designed to serve as a powerful antidote to any abuses of power by government officials." *Mills* v. *Alabama*, 384 U. S. 214, 219 (1966). Tolerating retaliation against journalists, or efforts to criminalize routine reporting practices, threatens to silence "one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Ibid.*

By denying Villarreal's petition, the Court leaves standing a clear attack on the First Amendment's role in protecting our democracy. Because this petition should have been granted, and the Fifth Circuit's decision should have been vacated, I respectfully dissent.